# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-2786

ZEBENEWORK HAILE GEORGIS,

*Petitioner,*

v.

JOHN ASHCROFT, United States Attorney General,

*Respondent.*

———————

Petition for Review of an Order
of the Board of Immigration Appeals
No. A75 310 383

———————

ARGUED APRIL 1, 2003—DECIDED MAY 20, 2003

———————

Before FLAUM, *Chief Judge*, and COFFEY and EVANS, *Circuit Judges*.

FLAUM, *Chief Judge*. Petitioner Zebenework Haile Georgis seeks review of a final order of the Board of Immigration Appeals ("BIA") denying her petitions for asylum and withholding of deportation and ordering her removal from the United States to Ethiopia, where she is a citizen. An Immigration Judge ("IJ") determined that Georgis's claims of racial and political opinion discrimination in Ethiopia did not merit asylum because they were not "internally consistent" and "inherently persuasive." Georgis appealed and the BIA affirmed the IJ's decision without opinion pursuant to 8 C.F.R. § 1003.1(a)(7). We vacate the removal order and remand for further proceedings.

## I. BACKGROUND

Georgis, a native and citizen of Ethiopia, entered the United States in June 1995 on a non-immigrant visitor's visa. In July 1997 the Immigration and Naturalization Service ("INS") issued Georgis a Notice to Appear, charging her under § 237(a)(1)(B) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1227(a)(1)(B), with overstaying her visa. Georgis conceded removability as charged but requested asylum under INA § 208, 8 U.S.C. § 1158, and withholding of deportation under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), as relief from removal. In her application Georgis claimed that since 1996 the Ethiopian government had been arresting and persecuting members of the Amharic ethnic and political group, including Georgis's husband, Afework Mulat ("Afework"), and three of her children. Georgis further alleged that government soldiers had interrogated her family and inquired as to her whereabouts, and that Afework and one son remained in jail because they belong to the All-Amhara People's Organization ("AAPO"), a political group opposing the Ethiopian government. Georgis herself had been a member of the AAPO when she was in Ethiopia and currently belonged to an AAPO support group in Chicago, Illinois. Georgis expressed her belief that she would be arrested and jailed for her AAPO membership if she were forced to return to Ethiopia.

At the hearing on her asylum claim, Georgis testified that she first came to the United States in 1991 to get medical treatment for one of her sons. She returned to Ethiopia in 1993 and began participating in AAPO activities in Addis Ababa, raising funds as well as organizing the women's wing of the party. Soon thereafter, in September 1993, Georgis and Afework were arrested along with several other AAPO members for protesting the earlier arrest of their party leader, Professor Asrat Woldeyes. Georgis and Afework were then taken to prison, beaten up, subjected to various forms of maltreatment and torture, including the

shaving of their heads, and detained for a day and a half. Georgis also claimed that her uncle, who was second in command to Professor Woldeyes, was killed as a result of the demonstration.

On cross-examination Georgis acknowledged that she had failed to mention her September 1993 arrest in her asylum application but claimed that it was because it "didn't count as imprisonment. In my mind what imprisonment I thought that it's in the central prison for longer terms and all that. That's why I didn't really mention it." She also maintained that she did not refer to the arrest in response to Item No. 4 of the application, which asked for a specific discussion of each incident of mistreatment encountered by Georgis or her family, because "it is a short term and short time, I thought it was not much relevance for the case." When questioned further, Georgis explained that the "reason I didn't mention it is because it's a past case. I didn't thought that it's going to help my case. I thought that the current situation that I have, my children's and my husband problem, that's what I emphasized it more than what happened to me."

Georgis further testified that she returned to the United States in 1995 following a call from her son's hospital. After she arrived, she received a letter from Afework stating that many of their friends had been arrested and "that he [was] not in a stable condition in Ethiopia." This letter was not submitted as evidence. Georgis also claimed to have later received a letter from her daughter Haregwine stating that Afework had been arrested and "terribly beaten on his face," but this letter was not submitted as evidence either. Georgis testified, however, that the letter said that Afework had been arrested in January 1996. The letter also allegedly stated that Haregwine and two of Georgis's other children, daughter Frehiwot and son Minase, had been arrested; that Haregwine had been raped by a prison guard while she was detained; and that the whereabouts of

Minase were unknown. On cross-examination Georgis was questioned about the inconsistency between her testimony that Afework had been arrested in January 1996 and her asylum application, which stated that the arrest occurred in October 1996. In response, Georgis explained that the discrepancy was due to the differences between the Gregorian and Ethiopian calendars;[1] because of these differences, she had "made a mistake on the—in the calendars that I said in my language. So it should be October 24 . . . 1996."

Another letter from Georgis's daughter Frehiwot *was* submitted into evidence. According to the letter, Afework had not been released after his arrest in October 1996 but was still being detained in the central prison. Georgis initially testified that this letter had been sent "around the beginning of the November of 1996," which was around the time her family had been arrested, but she later stated that the letter was sent four months after the arrest. On re-direct Georgis confirmed that the letter was dated "16-1-90," but that date, she said, is "in the Ethiopian calendar." She did not know what the corresponding date was under the Gregorian calendar.[2]

---

[1] Ethiopia uses a Julian calendar which is divided into 12 months of 30 days each plus a 13th month of five or six days (depending on whether it is a leap year) at the end of the year. The beginning of the Ethiopian new year occurs each September 1, which equates with September 11 in the Gregorian calendar (our modern western calendar). The Ethiopian calendar is approximately seven years, eight months, and several days behind the current Gregorian calendar, and dates are recorded as day-month-year in the European fashion (as compared with month-day-year in common American usage). For example, our April 1, 2003 (4-1-03), is March 23, 1995 (23-7-95), on the Ethiopian calendar.

[2] The translator recorded the Ethiopian date of 16-1-90 as the Gregorian date of September 22, 1997, but according to at least
(continued...)

In a November 1997 decision, the IJ denied Georgis's application for asylum and withholding of deportation, while granting her voluntary departure. The IJ stated that he "examined [Georgis's] application in concert with her testimony and . . . found numerous discrepancies." The IJ then made six "observations" in support of his conclusion: (1) Georgis did not mention the events of September 1993 in her asylum application; (2) Georgis's testimony that she was arrested at the trial of Professor Woldeyes on September 20, 1993, "appear[ed] to be in conflict with the information contained in [a] State Department opinion indicating that Professor Woldeyes was convicted on June 27, 1994"; (3) Georgis's application stated that her husband was arrested in October 1996, but she "specifically testified that it took place on January 24, 1996 (although later recanted)"; (4) Georgis's application indicated that her son Minase was still in jail, but at the hearing "her testimony was that his whereabouts are unknown"; (5) Georgis testified that the letter from her daughter Frehiwot "was mailed approximately four months after her arrest in November 1996," but "this appears unlikely . . . since the document submitted is dated September 22, 1997"; and (6) the "record does not

---

[2] (...continued)

one other source (a calendar conversion tool provided online by Douglas Zongker, a Ph.D. candidate in Computer Science and Engineering at the University of Washington, *available at* http://www.cs.washington.edu/homes/dougz/date/), the correct Gregorian date is September 26, 1997. Given that September 1 in the Ethiopian calendar is September 11 on the Gregorian Calendar, there should be a gap of ten days between the dates and not just six, meaning the translator's date may be erroneous. We note that this confusion over dates permeated the proceeding before the IJ and persists even on appeal. We found nothing in the record—no expert testimony or other authoritative reference—that definitively converts and fixes any of the dates referred to by Georgis in her application and testimony.

contain corroborative or supporting evidence relating to the respondent's alleged AAPO membership, the political activities or arrests of the respondent or her relatives, or her husband's alleged detention."

As to this last point, the IJ noted that Georgis had attempted to submit a copy of a letter from the Ethiopian Transitional Government Second Police Station that she said corroborated the facts and circumstances of her husband's arrest. But because the letter was not submitted until the day of the hearing, *see* Immigration Court of Chicago Local Operating Procedure 2 ("All proposed exhibits and briefs shall be received in the Immigration Court of Chicago no later than ten (10) calendar days prior to the scheduled Individual Calendar hearing unless otherwise authorized by the Immigration Judge"), was not certified, *see* 8 C.F.R. § 287.6,[3] and an extra copy of the translation was not provided for the government, the IJ excluded it from evidence. At the hearing, however, Georgis's lawyer explained that he did not submit the letter earlier because he had just received it from Ethiopia and that time constraints prevented him from obtaining an extra copy of the translation for the government's lawyer. With no objection from the government, the IJ accepted the letter into the record for identification purposes only and labeled it "Exhibit 4."

---

[3] Section 287.6 requires that official records from foreign countries be certified (in the form of an official publication or a copy attested to by an authorized foreign officer) in order to be admissible for any purpose. Since the IJ did not elaborate on his reasons for deciding the letter from the Ethiopian Transitional Government Second Police Station failed to meet the requirements of § 287.6, it remains unresolved whether the letter is even an "official record" that demands certification and also whether the submitted copy is not already properly certified (it appears to be imprinted with an official seal of some sort).

In June 2002 a single Member of the BIA determined that there was no reasonable possibility that the IJ's decision was incorrect and issued a "streamlined" order summarily affirming the decision. *See* 8 C.F.R. § 1003.1(a)(7). Georgis filed a timely petition for review in this court.

## II. DISCUSSION

### A. BIA's Streamlined Review Procedure

Georgis contends that the BIA abdicated its responsibility to review the IJ's ruling when it employed its streamlining procedure in her case. *See* 8 C.F.R. § 1003.1(a)(7). This regulation provides that a single Member of the BIA may affirm, without opinion, the results of an IJ's decision if the Member determines: (1) that the result reached in the decision under review was correct; (2) that any errors in the decision under review were harmless or nonmaterial; and (3) that (A) the issue on appeal is squarely controlled by existing Board or federal court precedent to a novel fact situation; or (B) the factual and legal questions raised on appeal are so insubstantial that three-Member review is not warranted. *Id.* If a case is streamlined, the IJ's decision becomes that of the BIA for purposes of judicial review. *Cf. Begzatowski v. INS*, 278 F.3d 665, 670 (7th Cir. 2002) (court of appeals does not directly review decisions of the IJ, except in cases where the BIA has expressly adopted the IJ's findings).

The government maintains that the BIA's decision to exercise its streamlining authority is not reviewable under the APA because it is an action that "has been committed to the absolute discretion of an agency." *See* 5 U.S.C. § 701(a)(2); *ICC v. Brotherhood of Locomotive Engineers*, 482 U.S. 270 (1987); *Heckler v. Chaney*, 470 U.S. 821 (1985). Without explicitly deciding this issue, we have upheld the BIA's use of the streamlining procedure in a

case whose facts presented no substantial issue of law and no basis for granting asylum. *Ciorba v. Ashcroft*, 2003 WL 1400572, at \*5 (7th Cir. March 21, 2003). Additionally, the First Circuit recently held that the streamlining procedure on its face neither violates due process, renders judicial review impossible, nor runs afoul of any statute. *Albathani v. INS*, 318 F.3d 365, 377 (1st Cir. 2003). For our purposes here (and in many cases it seems), it makes no practical difference whether the BIA properly or improperly streamlined review of Georgis's case.[4] Since we review directly the decision of the IJ when a case comes to us from the BIA pursuant to § 1003.1(a)(7), our ability to conduct a full and

---

[4] Assume, for instance, that the IJ's ruling was not supported by substantial evidence. Then, the BIA should not streamline the case because "the result reached in the decision under review was [not] correct." 8 C.F.R. § 3.1(a)(7). But if it did streamline, and the case came up to us on a petition for review, the substance of our review would be the same regardless of whose decision (the BIA's or the IJ's) we consider. *Cf. Brotherhood of Locomotive Engineers*, 482 U.S. at 279 (agency's refusal to reopen a proceeding is not reviewable where only "material error" has been alleged as the basis for reopening; the appeal would place "before the courts precisely the same substance that could have been brought there by appeal from the original order [but] on the strange, one-step-removed basis of whether the agency decision is not only unlawful, but *so* unlawful that the refusal to reconsider it is an abuse of discretion").

Consider, on the other hand, a case that is not "controlled by existing Board or federal court precedent"; for instance, a case interpreting a new regulation. If the BIA (improperly) streamlined that case, which then came before us on appeal, it could make a slight difference whose decision we review. If we look at the IJ's, we would decide the legal issue on the merits. But if we look at the BIA's, we would simply say that the case should have been considered by a three-Member panel and remand to the BIA for consideration. And this latter course seems preferable because it gives the BIA the first crack at interpreting its own rules.

fair appraisal of the petitioner's case is not compromised, and the petitioner's due process rights are not violated.

**B.      Georgis's Petition for Asylum and Withholding of Deportation**

We review decisions of the immigration courts to deny petitions for asylum and withholding of deportation for substantial evidence. *Ambati v. Reno,* 233 F.3d 1054, 1059 (7th Cir. 2000). We must affirm the BIA's decision if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole," *Useinovic v. INS,* 313 F.3d 1025, 1029 (7th Cir. 2002), and we are not at liberty to overturn the agency's determination "simply because [we] would have decided the case differently," *Yadegar-Sargis v. INS*, 297 F.3d 596, 601 (7th Cir. 2002). Only where the evidence in support of the application is "so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution" will we reverse the Board's decision for lack of evidence. *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992). While our review of the IJ's credibility determinations is highly deferential, *Nasir v. INS*, 122 F.3d 484, 486 (7th Cir. 1997), we will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence.

In this case the IJ denied Georgis's request for asylum and withholding of deportation because he found her claims incredible due to "numerous discrepancies" in her asylum application and her hearing testimony. The IJ gave six reasons for his conclusion that Georgis's claims were neither "internally consistent" nor "inherently persuasive," quoted several passages from the State Department's generalized profile of asylum applications and country conditions in Ethiopia for 1997, and summarily denied Georgis's request for asylum or withholding of deportation. Of the six reasons given by the IJ, three specifically relate to discrepancies in

dates that Georgis explained at the hearing were due to her unfamiliarity with our calendar versus the Ethiopian calendar; one involves the specificity and extent of Georgis's knowledge of her son's whereabouts; one concerns the lack of corroborating or supporting evidence relating to Georgis's AAPO membership, her and her family's political activities and arrests and persecution by the Ethiopian government, and her husband's arrest and prolonged imprisonment; and one addresses Georgis's failure to discuss the events relating to her 1993 arrest at the trial of Professor Woldeyes in her asylum application.

In the context of the entire administrative record, these six reasons alone are insufficient to support the IJ's decision to discredit Georgis's testimony. On appeal Georgis argues, and the government acknowledges, that at least four of the IJ's given reasons are minor inconsistencies which are easily resolved by other facts in evidence. For instance, the IJ found Georgis's testimony that she was arrested "at the trial of Professor Woldeyes on September 20, 1993," to be inconsistent with the State Department's report "that Professor Woldeyes was convicted on June 27, 1994." But obviously, the time of trial is different from the time of conviction, and the government admits that the record does not indicate when Professor Woldeyes's trial began or ended. The IJ also found the statement in Georgis's application that "her son Minase is still in jail" to be inconsistent with her later testimony "that his whereabouts are unknown." We are not convinced these statements are inconsistent, but even if they are, the government concedes that Georgis seemed to have believed when she submitted her application that Minase was in jail but was later informed by her daughter Frehiwot that his whereabouts were unknown. Finally, the IJ's reliance on Georgis's "inconsistent" testimony regarding various dates, including the date of her husband's arrest and the date of a letter written by her daughter Frehiwot, is unconvincing given that Georgis

repeatedly expressed her confusion regarding the differ-ences between the Ethiopian and Gregorian calendars. The transcript of the hearing reveals that everyone, and not just Georgis, seemed unclear about converting the dates from Ethiopian to Gregorian. Moreover, each time Georgis was asked to clarify a date, she tried to place the event in ques-tion in its proper chronology even if she could not calculate the correct date in our calendar system.

We agree with Georgis's assertion and the government's concession that these four inconsistences should be treated as minor. Thus, of the six reasons why the IJ found Georgis not credible, there remain two that we must review for sub-stantial evidence. One is that the record did not "contain corroborative or supporting evidence relating to the respon-dent's alleged AAPO membership, the political activities or arrests of the respondent or her relatives, or her husband's alleged detention." We do not find this explanation persua-sive for a number of reasons. As an initial matter, it is not necessary for an asylum applicant to submit corroborating evidence in order to sustain her burden of proof. 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.").

More importantly, however, Georgis *did* submit corrobo-rating evidence. The IJ received into evidence and marked as "Exhibit 2" a translated version of Frehiwot's letter, which stated that Afework had not been released following his arrest but remained in the central prison. Also submit-ted by Georgis and included as Exhibit 2 was a letter from the chairperson of the AAPO Support Group in Chicago, Illinois, confirming that Georgis was an active member in the organization. Further, Georgis attempted to submit a letter from the Ethiopian Transitional Government Second Police Station that corroborated the facts related to Afework's arrest, but the IJ excluded the letter because it was not submitted in advance of the hearing date, was not

properly certified, and because no translation was provided with the Government's copy of the document (although a translation was provided to the IJ and the government had access to it). As discussed earlier, we are uncertain whether the letter qualifies as an "official record" within the meaning of 8 C.F.R. § 287.6, but even if it does, § 287.6 is not the only way that Georgis could authenticate the document. *See Khan v. INS*, 237 F.3d 1143, 1144 (9th Cir. 2001) ("documents may be authenticated in immigration proceedings through any recognized procedure, such as those required by INS regulation or by the Federal Rules of Civil Procedure"). In *Khan* the Ninth Circuit held that it was error to exclude documents verifying the petitioner's testimony that he had been arrested and detained for lack of certification when the denial of asylum was based in part on the lack of corroborating evidence. *Id.* at 1144. Here, under nearly identical factual circumstances, we agree with the Ninth Circuit that it was error for the IJ to exclude the letter from the Ethiopian Transitional Government Second Police Station since the IJ expressly stated that it was for lack of corroborating evidence like this letter that he found Georgis not credible and denied her asylum application.

The remaining reason why the IJ discredited Georgis's claims was that her asylum application did not mention that she had been arrested and beaten in September 1993 for demonstrating in support of Professor Woldeyes, nor did it mention that her uncle had been killed due to those demonstrations. Specifically, Item 4 of the application asked whether Georgis "or any member of [her] family [had] ever been mistreated/threatened by the authorities." Item 5 then asked if Georgis "or any member of [her] family [had] ever been arrested, detained, interrogated, convicted and sentenced, or imprisoned." While citing other, more recent examples of the persecution of her family members by the Ethiopian government, Georgis did not mention the September 1993 events in response to either of these ques-

tions. At her hearing Georgis explained that the reason she did not mention the 1993 arrest in response to Item No. 5 was because she did not believe that "the incident would count as imprisonment. In my mind what imprisonment I thought that it's in the central prison for longer terms and all that. That's why I didn't really mention it." She further explained that she did not bring up the incident in response to Item No. 4 because "it is a short term and short time, I thought it was not much relevance for the case. . . . I didn't mention it is because it's a past case. I didn't thought that it's going to help my case. I thought that the current situation that I have, my children's and my husband problem, that's what I emphasized it more than what happened to me." The IJ thought that this explanation did "not appear to be an adequate justification for failing to include an incident which could be viewed as past persecution."

Although we consider Georgis's reasons plausible, we recognize that it is the role of the IJ and not this reviewing court to decide whether her explanation justified her omitting the incident from her asylum application. However, having found that the other five reasons given by the IJ for discrediting Georgis are either unsupported by the evidence in the record or based on incomplete or improperly excluded evidence, we are not inclined to defer to his credibility determination on this remaining sixth ground alone.

### III. CONCLUSION

We therefore VACATE the deportation order and REMAND for further proceedings in accordance with this opinion. Although the choice of a presiding judge is left to the discretion of the BIA, we strongly urge the BIA to assign a different judge to Georgis's case on remand. *Cf.* Circuit Rule 36 of the United States Court of Appeals for the Seventh Circuit. *See also Kerciku v. INS*, 314 F.3d 913, 919 (7th Cir. 2003).

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*