# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 02-3676

JEANNETTE UWASE,

*Petitioner*,

v.

JOHN ASHCROFT, Attorney General
of the United States,

*Respondent.*

———————

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A77 819 928

———————

ARGUED SEPTEMBER 3, 2003—DECIDED NOVEMBER 21, 2003

———————

Before POSNER, KANNE, and EVANS, *Circuit Judges.*

KANNE, *Circuit Judge.* Jeannette Uwase seeks review of a removal order issued by the Board of Immigration Appeals ("BIA") summarily affirming the Immigration Judge's ("IJ") denial of Uwase's asylum application, petition for withholding of removal, and request for relief under the Convention Against Torture Act. Because the IJ's adverse credibility determinations were not based on substantial evidence and because the IJ gave undue weight to Uwase's alleged lack of corroborating evidence, we vacate the removal order and remand Uwase's case for rehearing.

## I. History

Uwase, a native of Rwanda, was fourteen years old when the former Rwandan president died in an April 1994 plane crash. Following the president's death, members of a Hutu militia, known as the Interahamwe, launched an ethnic cleansing campaign against Tutsi Rwandans and those with mixed Hutu-Tutsi tribal heritage. Tutsi rebel soldiers, called the Rwandan Patriotic Front ("RPF"), rose up to meet the Interahamwe, resulting in civil war.

Prior to the war, Uwase lived in the capital city, Kigali, with her parents and seven siblings. Her father, a prominent Hutu businessman, had married a Tutsi woman; thus, Uwase and her brothers and sisters were of mixed ethnicity. When the violence broke out and they learned they were targeted for extermination, the family fled Kigali, believing they could not hide their identities because of the father's prominence and Rwanda's small size. In July 1994, after moving from city to city in the hope of escaping the fighting, Uwase's parents heard on the radio that the war was over and that it was safe for people to return to their homes. Uwase and her older sister, Francine Uwamahoro, were too frightened to go back, but her parents left with the six younger children. Uwase and her sister fled Rwanda for the refugee camps in the Democratic Republic of Congo ("DRC").

Once in the DRC, the sisters moved from camp to camp in search of safety. Because of their mixed ethnicity, they struggled to gain acceptance in the camps largely filled with Hutus seeking protection from the RPF. At some point, the sisters were separated. Uwase suffered various deprivations during the two years she spent in the camps, and was ultimately herded back to Kigali when her camp was attacked by RPF soldiers in October 1996.

In Kigali, the RPF detained the sixteen-year-old Uwase in a collection center. There they interrogated her due to her

mixed ethnicity and because she was found in a Hutu refugee camp. They accused her of participating in the Interahamwe's 1994 genocide and subjected her to abuse, including putting her feet in very cold water, tying her hands and legs, threatening her with violence, and withholding food. They ultimately released her in December 1996, due in part to her young age.

Upon release, Uwase found her way back to her family home. There she discovered her family gone and RPF soldiers occupying the house. Uwase testified that the soldiers at first seemed friendly, and allowed her to sleep in what used to be her room until she could find a place to go. Later that night, though, two soldiers woke her, raped her at gunpoint, and beat her. They accused her of taking part in the genocide, as they had discovered she was part Hutu. Afterwards, they confiscated her identification papers and left her bleeding at a bus station, threatening her with death if she told anyone what they did. According to Uwase, the soldiers took her identification papers because if she was found without them, she would be accused of being a member of the Interahamwe and killed.

Uwase made her way from the bus station to the home of her mother's friend, Frida Umutoni. Frida allowed Uwase to live with her in Kigali and helped her to enroll in secondary school. The two also sought to bring the rape to the attention of the authorities, but, according to Uwase, none would act for fear of retribution. At some point after coming to live with Frida, Uwase was reunited with her older sister, Francine. They never discovered the fate of the rest of their family, except that Frida told them their father was killed in prison.

Uwase lived with Frida for two years until Frida and another family friend living in the United States, Jean Ntakirutimana, helped Uwase and her sister Francine come to America to study English. The sisters entered the U.S. in

December 1998 on student visas to attend the South Bend English Institute. Uwase, now nineteen, overstayed her student visa, resulting in the removal proceedings and her asylum application. She testified before the IJ that she fears returning to Rwanda because she believes she will be subjected to further persecution due to her mixed ethnicity and imputed political opinion. She also fears retribution from government soldiers because she sought to prosecute them for raping her.

The IJ denied Uwase's application. Although he found Uwase's request for asylum plausible and reasonable based on evidence of the country conditions in Rwanda, he did not find Uwase's testimony internally consistent or persuasive. The IJ concluded that she did not meet her burden of proving she was subjected to past persecution; specifically, he found that she did not establish that she is of mixed Hutu-Tutsi tribal heritage.

Uwase appealed. The BIA affirmed the IJ's determination without opinion under its streamlining procedure. *See* 8 C.F.R. § 1003.1(a)(7) (formerly 8 C.F.R. § 3.1(a)(7)). Having appropriately exhausted her administrative remedies, Uwase now seeks review from this Court.

## II.  Analysis

In streamlined cases, the IJ's decision becomes that of the BIA for purposes of judicial review. *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003). We apply the substantial evidence standard when reviewing immigration court decisions denying petitions for asylum and requests to withhold deportation. *Id.* at 967. The BIA's decision must be affirmed if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Id.* (quotations omitted).

Here, the bulk of the evidence consists of Uwase's testimony, much of which the IJ found to be incredible and uncorroborated. Since it is Uwase's burden to demonstrate she qualifies for asylum, her failure to convince the IJ of the truth of her claim doomed her case. *See Krouchevski v. Ashcroft*, 344 F.3d 670, 673 (7th Cir. 2003). The IJ's credibility determinations are entitled to great deference, and we are not at liberty to overturn the agency's decision "simply because we would have decided the case differently." *Georgis*, 328 F.3d at 967 (quotations omitted). Yet, "we will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence." *Id.* at 968. Further, an IJ's credibility determination must be supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Krouchevski*, 344 F.3d at 673 (quotations omitted). Corroborating evidence is essential to bolster an otherwise unconvincing case, but when an asylum applicant does testify credibly, "it is not necessary for [her] to submit corroborating evidence in order to sustain her burden of proof." *Georgis*, 328 F.3d at 969 (citing 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration.")).

In denying Uwase's application for failing to prove that she suffered persecution because of her mixed Hutu-Tutsi ethnicity, the IJ pointed to four alleged problems with the internal consistency and persuasiveness of her testimony: (1) her inability to explain a stamp on a letter from Frida Umutoni; (2) testimony inconsistent with her Form I-20 documentation; (3) testimony inconsistent with her national identity documentation; and (4) her failure to produce her sister Francine as a witness. We disagree with the IJ's conclusions based on the record before us and discuss each issue listed above in turn.

A. Letter from Frida

Uwase entered as an exhibit, without objection, a letter from Frida in support of her asylum application. In the letter, Frida, who still resides in Kigali, wrote that following Uwase's departure, Frida had been subjected to interrogations by local police "to answer how I helped you to escape thou [sic] you was 'Interahamwe' mixed of Hutu-Tutsi." (A.R. at 166.) Frida goes on to state that she later found out the two soldiers who raped Uwase were involved in the interrogations and that they feared Uwase's return in case she attempted to prosecute them. *Id.* Frida wrote: "Please Jeannette don't attempt to come back here to Kigali, because I know for sure you will be killed. After the death of your Father, I have been trying to locate the rest of your family, including your loving Mother unsuccessful [sic]." *Id.*

The IJ found fault with the letter because it exhibited an ink impression of a rubber stamp near the signature line. The imprint of the rubber stamp bore the name of Uwase's father—Jean Bosco Gisagara—and the name of his beer distribution business. Over the stamp someone scrawled their signature or initials. At the hearing, Uwase could not explain the presence of the stamp or how Frida may have come to be in possession of it. Uwase was not asked to identify the signature or initials, and no evidence was presented on whose they might be. Uwase's inability to explain the stamp led the IJ to assume that someone from Uwase's family must have given Frida the stamp and that Frida placed the stamp on the letter. From this, the IJ deducted that Uwase's father may not have been murdered or her family scattered and lost, and deemed her story of persecution based on her mixed ethnicity incredible. Thus, the letter meant to corroborate Uwase's otherwise consistent testimony served to discredit it.

The IJ's logic—that Uwase's inability to explain a stamp appearing on a letter sent from a third party in Kigali in-

dicates that her family may be intact and that she may not
be of mixed Hutu-Tutsi ethnicity and so did not suffer per-
secution—is simply too tenuous based on the record. *See
Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002) ("Adverse
credibility determinations based on speculation or conjec-
ture, rather than on evidence in the record, are revers-
ible."). In our review of the letter in question, we note that
the stamp bears no date and there is no testimony explain-
ing whether the stamping instrument was made prior to the
civil war or after. Even assuming, as the IJ did, that Frida
placed the stamp on the letter, there are many explanations
how she may have come to possess the stamp that do not
discredit Uwase's story. Indeed, the IJ could have as easily
inferred that something terrible happened to Uwase's
family; otherwise, the stamp would not have left their
possession. The IJ's speculation regarding the significance
of the stamp, unsupported in the record, does not form a
valid, cogent reason for a negative credibility finding.

## B.  Form I-20 Testimony

Uwase testified before the IJ under repeated questioning
that Jean Ntakirutimana, her father's friend, supported her
financially while in the United States. The IJ found this
testimony inconsistent with her Form I-20, which was part
of the paperwork necessary for her student visa. The Form
I-20 stated support would come from Rwanda, not the U.S.
The IJ also criticized Uwase for failing to present an
affidavit or other testimony from Jean so he could clear up
the discrepancy and otherwise confirm her story.

We consider Uwase's allegedly conflicting testimony about
her source of support to be a minor inconsistency, if that,
having nothing to do with her claim that she feared for her
life in Rwanda. *See Gao*, 299 F.3d at 272 (stating that minor
discrepancies that do not "involve the heart of the asylum

claim" are not an adequate basis for an adverse credibility finding); *Diallo v. INS*, 232 F.3d 279, 288 (2d Cir. 2000) (holding that minor and isolated disparities in testimony need not be fatal to credibility, especially when they do not concern material facts).

We note that the record, which does not include a copy of the Form I-20 in question, does not establish who filled out the form, just that Uwase signed it. Based on the hearing transcript description of the form, it appears to have been in English, not in Uwase's native language. (A.R. at 123.) The offending information on the form appears to have been contained in a pre-printed section regarding financial support while studying in the U.S. A box reading "funds from another source" was checked, with the words "sponsor in own country" either pre-printed or written in. *Id.*

When asked to explain why the form differed from her testimony that Jean, who was not in her own country but in America, would provide the support, Uwase recounted that Frida accompanied her to the U.S. embassy to help her obtain her student visa and assisted with responding to the consular officer's questions. Uwase testified, through an interpreter, "I don't really know how the financial arrangements were made between Freda [sic] and Jean. However, I remember that Freda [sic] told the embassy that accommodation was not a problem. Jean would take care of it." (A.R. at 125.)

Myriad reasons exist why the form came to represent facts differently from those testified to repeatedly and consistently by Uwase. There could have been a miscommunication or misunderstanding if a third party filled out the form, or a mistranslation if Uwase filled out the form, to name a few. The IJ did not thoroughly explore these, or any other possible explanations for the inconsistency, casting doubt on his credibility determination. *See Georgis*,

328 F.3d at 968 ("[W]e will not automatically yield to the IJ's conclusions when they are drawn from insufficient or incomplete evidence."). More importantly, whether Uwase received financial support from someone in the United States or someone in Rwanda does not bear directly on whether she suffered past persecution because of her mixed ethnicity. Corroborating testimony from Jean was therefore unnecessary with regard to this minor point and could not have been anticipated by Uwase.

C.  Identification Documents

Uwase testified about three different identification documents. She stated that the soldiers who raped her in December 1996 confiscated her camp identification papers ("camp ID"). Uwase also testified that she received her national identification card ("national ID") sometime after this event, but before she started secondary school in Kigali in July 1997. She submitted a copy of her national ID as a hearing exhibit. The third piece of identification discussed was a card necessary for her to enroll in secondary school in Kigali ("school ID"). Initially, Uwase testified that Frida helped her to obtain the national ID, but later corrected herself and stated that Frida helped her to obtain the school ID. According to Uwase, she needed both the national ID and the school ID to meet school eligibility requirements. She did not submit her school ID in support of her application. Thinking it unimportant, she left it behind in Rwanda.

The IJ found fault with Uwase's testimony regarding the identification documents because he did not understand that the camp ID and the national ID were two separate forms of identification, although the record is clear in this regard. Uwase testified that since the soldiers took her camp ID, she needed to get another identity card. Instead of getting another camp ID, she traveled to Mugasera to

collect her national ID. She explained, quite lucidly, under vigorous questioning from both the government and the IJ, that she had been processed for the national ID in November 1996 while in the Kigali detention camp and was given a camp ID to serve as identification while she waited for the national ID's issuance. (See A.R. at 130-132; 136-137.) When released from the Kigali detention center in December 1996, she was in possession of the camp ID only, which the soldiers then confiscated. (See A.R. at 127-128; 131-132; 150.) Instead of getting a duplicate camp ID to replace the one taken by the soldiers, sometime prior to July 1997 she traveled to her father's hometown, Mugasera, where her national ID was finally given to her. (See A.R. at 128, 135-137.) According to Uwase, the government system in place required her to travel to her father's hometown in order to collect the national ID. (See A.R. at 133, 135.)

The IJ, however, gleaned from Uwase's testimony that she was in possession of her *national* ID upon release from the camp, and it was this document the soldiers took and which she subsequently replaced. Noting the November 20, 1996 date on the supposed "replacement" national ID submitted in support of her asylum application, the IJ questioned how a document meant to replace one taken in December 1996 could be dated November 1996. Apparently because the IJ remained confused about the nature of the ID taken from Uwase by the soldiers, he did not credit Uwase's explanation why she received the national ID in 1997 although it had a November 20, 1996 date. The IJ also found that Uwase's correction that Frida helped her obtain the school ID as opposed to the national ID impugned Uwase's credibility. He noted that Frida failed to confirm this story in the letter supplied in support of Uwase's asylum application or to send the school ID, which Uwase left behind in Rwanda.

Although the IJ considered Uwase's testimony about the three identification documents contradictory, the record

reads quite clearly and does not support the IJ's adverse credibility finding. The IJ simply made a mistake of fact with regard to finding that the soldiers took Uwase's national ID. Further, we do not believe that Uwase's correction that Frida helped her to obtain her school ID as opposed to her national ID lessens the impact of Uwase's testimony, which is otherwise consistent. The IJ should not have faulted Uwase for Frida's failure to provide corroborating evidence about the various identification papers because neither Uwase nor Frida could have anticipated that the IJ would be confused by Uwase's clear recitation of the Rwandan government's methods for tracking its people.

### D. Francine's Failure to Appear

Uwase's sole witness on her witness list, her sister, Francine Uwamahoro, did not attend the hearing due to a stomach illness. Francine had been granted political asylum in September 1999. Despite Francine's inability to attend, Uwase presented no evidence describing the basis for Francine's asylum request, just a copy of the government's letter recommending approval of Francine's petition. At the close of the hearing, the IJ twice, without prior warning, tried to reach Francine at home via telephone so she could provide corroborating testimony. No one answered. When asked if her sister was supposed to be at home that day, Uwase answered that they had not discussed her sister's plans and that it was possible she was out. Uwase's attorney asked for a continuance to produce Francine only after the evidence had closed and it became apparent, through the IJ's repeated telephone calls, that the IJ considered Francine's testimony vital to Uwase's case. In his decision, the IJ accorded great weight to Uwase's inability to produce her sister in person or on the phone or to provide any documentary evidence regarding Francine's asylum claim.

This was despite acknowledging that "[i]t is clear from the respondent's testimony that she had experienced persecution and acts separate from Francine's." (A.R. at 69.)

The IJ's focus on Uwase's inability to provide corroborating evidence from Francine was misdirected. As the sisters were separated in the DRC refugee camps and not rejoined until after Uwase found sanctuary at Frida's, Francine could not corroborate Uwase's claims of persecution at the hands of the RPF, which were central to Uwase's asylum claim. Francine, no doubt, endured her own horrors, but did not witness Uwase's.

Since Francine shared the same parents as Uwase, Francine could have corroborated the key fact that Uwase was of mixed Hutu-Tutsi ethnicity. Francine's testimony on that issue may have been duplicative, though, if the IJ had properly considered Frida's letter, which reflects Uwase's mixed heritage. Regardless, corroborative evidence on key facts supporting an alien's asylum claim are not necessary, where, as we have examined here, the alien's testimony is otherwise credible. *Georgis*, 328 F.3d at 969.

Uwase explained that her sister did not appear as planned because she was ill with stomach problems. Uwase, who lived with her sister, did not seek a continuance at the beginning of the hearing, arrange for her sister's affidavit, or offer a copy of her sister's asylum petition in support of her own. Although her failure to do so exhibited a lack of diligence, we do not think it enough to cast suspicion on Uwase's credibility in light of how little corroboration her sister could provide. Nor do we think it proper for the IJ to have viewed negatively Francine's failure to answer the phone when called, without warning, at the close of the hearing, considering the many possible explanations why she was not available.

Because we believe the IJ's decision to deny Uwase's application was not based on substantial evidence in light

of his credibility determination errors and the undue weight given to the alleged lack of corroborating evidence, we remand for rehearing. We note that Uwase raises two other issues on appeal: that the IJ erred in failing to grant her a continuance to make Francine available to testify and that the BIA erred in summarily affirming the IJ's decision without reviewing the additional evidence presented on appeal. We do not reach these issues, however, because on rehearing, Uwase will have the opportunity to present live testimony from her sister as well as additional documentary evidence. Like Uwase, the government will also have an opportunity to submit additional evidence at rehearing, including updated evidence of country conditions.

### III. Conclusion

We VACATE the BIA's removal order and REMAND for rehearing.

A true Copy:

   Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*