**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 19, 2005[*]
Decided May 13, 2005

**Before**

Hon. ILANA DIAMOND ROVNER, *Circuit Judge*

Hon. TERENCE T. EVANS, *Circuit Judge*

Hon. ANN CLAIRE WILLIAMS, *Circuit Judge*

No. 04-1705

| | |
|---|---|
| GRACE SUSAN NANYANGE,<br>    *Petitioner,* | Petition for Review of an Order of<br>the Board of Immigration Appeals |
| *v.* | No. A95-585-765 |
| ALBERTO GONZALES, Attorney<br>General,<br>    *Respondent.* | |

**O R D E R**

Ugandan citizen Grace Susan Nanyange applied for asylum and withholding of removal, claiming that she was detained and raped in Uganda because she supported an opposition presidential candidate. The Immigration Judge denied relief, finding that Nanyange's testimony was inconsistent and therefore not

---

[*] Attorney Godfrey Y. Muwonge, counsel for the petitioner, did not appear for oral argument on April 19, 2005. Mr. Muwonge did call the court, shortly before 9:30 a.m., to say that he could not appear due to illness. With that, we heard an oral argument from the attorney for the respondent and ordered that the case would be decided on the briefs. Mr. Muwonge's nonappearance, the subject of orders issued on April 19 and April 28, will be addressed in a separate order which we will issue in due course.

credible.  Nanyange appealed, and the Board of Immigration Appeals affirmed the IJ's decision without opinion.  Because we find that the IJ's credibility determination was not supported by specific and cogent reasons, we grant Nanyange's petition for review, vacate the IJ's decision, and remand Ms. Nanyange's petition for further proceedings.

The INS began removal proceedings against Nanyange in August 2002 for overstaying her visitor's visa.  Nanyange apparently came to the INS's attention when she applied for asylum and withholding of removal, based on her support of an opposition presidential candidate.  She maintained that this support led Ugandan officials to "accuse [her] of being a rebel collaborator which in Uganda is equal to a death sentence."  In a lengthy affidavit attached to her application, Nanyange detailed her political activities, her subsequent detentions and rapes at the hands of Ugandan officials, and eventual flight from the country.  She claimed that, should she be returned to Uganda, she would "be arrested, detained, raped again and possibly killed."

Nanyange repeated the substance of her application in testimony at her hearing before an IJ in November 2002.  She stated that her family's problems in Uganda began in 1997, when her husband, a member of the local council that implemented regulations for the Ntinda region (just outside the capital city of Kampala), expressed opposition to the council's policies preventing journalists and the general public from having access to council meetings.  Nanyage says police arrested, detained, and beat her husband on three occasions that summer.  Fearing for his life, he fled the country in August and resurfaced in Japan two months later.

Nanyange herself became politically active in 2001, when she volunteered as a logistics advisor for the presidential campaign of Kizza Besigye, a retired army colonel who was considered to be the "the most significant electoral challenge" incumbent President Yoweri Museveni had ever faced.  In this volunteer position, Nanyange organized rallies, dealt with campaign finances, and discussed Besigye's agenda with voters in her region.  She stated that "government military agencies" frequently disrupted her rallies and arrested supporters.  Besigye lost the election to Museveni and fled the country amidst rumors that government security officers were planning to arrest him.

After Besigye's departure, Ugandan authorities monitored Nanyange more closely, eventually detaining and raping her.  In July 2001, when Nanyange returned from an HIV-prevention conference in Buenos Aires, the chairman of the local council (the same council Nanyange's husband had served on and later opposed) came to her home and accused her of making the trip to lobby for funds for Besigye.  A few days later, he returned with two local guards and took her to the "chief directorate of military intelligence" for interrogation.  The chief directorate

asked her why she was campaigning for Besigye and she responded that she had a legal right to do so.  He then ordered her detained at the Ntinda police station, where she was placed in a small, dark cell with her hands tied behind her kandoya style[1]  and her legs spread and tied to poles.  Nanyange testified that she was then raped by two men; although her cell was too dark to identify them, she heard them speaking Swahili, which led her to believe that they were policemen.  The attackers also struck her with the butts of their guns.  Nanyange was released the next day after her sister contacted an attorney, Christine Mugerwa, who spoke to a government official who intervened on Nanyange's behalf.  Although Nanyange was too embarrassed to go to the hospital, her sister asked a doctor of traditional medicine to come to the house, tend to the blisters Nanyange suffered when she was tied up, and treat her with antibiotics.

The chairman of the local council continued to monitor Nanyange and question her about her activities.  He told her that she should report to him "whenever [she] was going away from home, if it wasn't for [a] walk."  He became convinced that Nanyange was aiding "impending rebels from the southern part of Uganda, from Rwanda to Uganda, and the government believed those rebels were loyal to Besigye."  He accused her of channeling funds from her husband to rebels.  In September 2001 the council chairman came to Nanyange's home and announced that he was going to spend the night there.  He told her that she would have to "make a relationship" with him to save herself from his charges that she was connected to rebel groups.  Although Nanyange called for her neighbors' help, the chairman sent them away and ordered local guards to detain her.  She was once again taken to the police station, tied up, beaten, and raped by two men.  Again she avoided the hospital; the same doctor of traditional medicine returned to her home and treated her.

After this second episode Nanyange decided to flee Uganda because she believed her "life was quite in danger."  She managed to secure an invitation to attend another HIV-prevention conference, this time in Florida.  She obtained a visitor's visa and took a night flight out of Uganda so that her movements would be less closely scrutinized.  Nanyange arrived in the U.S., and after a few days at the conference traveled to Chicago, where she stayed with a friend.  In July 2002 Nanyange received a letter from her sister warning her that the chairman was still looking for her.  According to the letter, the chairman had searched Nanyange's home several times, detained her brother and questioned him about her

---

[1]"Kandoya" is a common form of torture in Uganda whereby a prisoner's chest is stretched painfully tight by binding his arms together behind his back. *See* Human Rights Watch, *State of Pain: Torture in Uganda, at* http://hrw.org/reports/2004/uganda0404/index.htm.

whereabouts, and confiscated her vehicle.  Based on this information, Nanyange testified that she believed she would be killed if she returned to Uganda.

The IJ and the lawyer for the government asked Nanyange to elaborate on a number of points that would later serve as a basis for the IJ's adverse credibility determination.  First, they sought more detail about Nanyange's husband.  Although Nanyange stated that she spoke to her husband twice a month, she was unable to provide details about his employment, other than to say that he did "mechanical work" and that he was "surviving."  Nor could she confirm her husband's immigration status in Japan; she stated that he had "report[ed] to the police authorities" upon his arrival and that she believed he was there legally, but she didn't know anything about his visa.  Nanyange also expressed uncertainty as to her husband's grasp of the Japanese language and his plans for the future.  When asked why she had not discussed these topics with her husband, Nanyange responded that "African men a bit funny. They . . . really don't want to discuss much of their hardships to . . . the ladies so much."

Next the lawyer for the government questioned Nanyange about her detentions, asking if attorney Mugerwa helped obtain her release both times.  When Nanyange answered yes, the government asked why Mugerwa's affidavit acknowledged her providing assistance only with the second detention.  Nanyange could not explain, but simply stated that her sister had told her that Mugerwa helped on both occasions.  Similarly, the government inquired as to why Nanyange had stated in an INS interview that she did not seek medical help after her rapes, but testified at her hearing that a doctor came to her home to treat her.  Nanyange responded that the doctor who had helped her was a "local traditional doctor" and not a medical doctor.  She did not mentioned him in her INS interview, she said, because she "thought they meant going to a hospital," which she had not done.

The IJ was most concerned, however, with Nanyange's assertion that the chairman of the local council had accused her of raising funds for rebels.  In an extensive colloquy, he asked her to identify "the movement or group" of which the chairman had been speaking.  She stated that she really didn't know, but suggested that he might have meant the Allied Democratic Forces or some unnamed people "trying to come into Uganda from Rwanda, and also regarded as rebels."  The gist of the chairman's accusation, she repeated, was that she was receiving money from her husband to channel to rebels loyal to Besigye.  The IJ then interjected that "there have never been any rebels attacking Uganda from the South" and that the leaders of Uganda and Rwanda were on good terms with one another.  Nanyange agreed that in fact no rebels ever actually attacked Uganda from Rwanda, but asserted that the chairman nonetheless accused her of being involved in fundraising for such an attack.  The IJ then repeatedly upbraided her, asking "how [she] could be accused of aiding a group which didn't exist."  Nanyange responded

that the chairman had accused her of many "bad activities, which [she] wasn't doing at all," and that this was simply another example. She reasserted that, contrary to the chairman's belief, "Besigye did not have any rebel group."

In addition to her testimony, Nanyange introduced several documents into the record. First, she submitted a letter from her sister describing the chairman's continuing efforts to locate her and urging her not to return because "the moment these people get their hands on you you will be dead." She also presented a letter from another campaign worker attesting to her involvement in Besigye's logistics department and an affidavit from attorney Mugerwa corroborating her two arrests and detentions. Finally, she submitted a number of newspaper articles and reports from human rights organizations discussing the Ugandan government's monitoring and harassment of opposition political forces and the eventual flight of Colonel Besigye.

The IJ denied Nanyange's application because her "sworn testimony has been changed at so many points, that there is reason to question the material parts of her account, namely whether she was detained and whether she was raped, as she contends." Specifically, the IJ disbelieved Nanyange's testimony with regard to: (1) her involvement with rebels in Uganda, (2) her husband's circumstances in Japan, (3) the medical treatment she received after being raped, and (4) who had interceded with the government to obtain her release from detention after her rapes.

Nanyange first argues that the IJ erred when he determined that her testimony was not credible. She claims that the "inconsistencies" the IJ found in her testimony are no more than "misunderstandings created by the IJ's or the Government's Trial Attorney's aggressive cross-examination."

An IJ's credibility determinations are typically given great deference and overturned only in "extraordinary circumstances" where they are not supported by "cogent reasons" that "bear a legitimate nexus to the finding." *Tolosa v. Ashcroft*, 384 F.3d 906, 909 (7th Cir. 2004). They should not be disturbed simply because a different credibility finding could also be supported by substantial evidence. *Capric v. Ashcroft*, 355 F.3d 1075, 1086-87 (7th Cir. 2004). We have warned, however, that "adverse credibility determinations should not be grounded in trivial details or easily explained discrepancies" if they are to survive appellate review. *Korniejew v. Ashcroft*, 371 F.3d 377, 387 (7th Cir. 2004). Careful review is especially important because an adverse credibility determination in essence "dooms" an alien's asylum claim. *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003).

The IJ here failed to articulate cogent reasons that bear a legitimate nexus to his credibility finding. He rejected Nanyange's testimony based on four

inconsistencies that, upon careful inspection of the record, are either not inconsistent or not material to Nanyange's claim. The IJ first faulted Nanyange for saying "that there was actually a group of armed rebels who invaded Uganda, [when] as she admitted later, and the historical record shows, there has not been any armed group invading southern Uganda in the summer of 2001." The IJ viewed Nanyange's inconsistencies as a sign of "invention to cover up or explain inconsistencies in her account." But the IJ's characterization misrepresents Nanyage's testimony, which was that the local chairman falsely accused her of channeling funds to rebels loyal to Besigye. Nanyange steadfastly denied knowing which rebels the chairman had in mind. When the IJ continued to press for the name of a rebel group, Nanyange suggested that the chairman might have been referring to "the Allied Democratic Forces coming from the western." The State Department's Country Report in fact recognizes that this group was active in Uganda during this period, although its "activities decreased during the year." U.S. Dep't of State, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2001 (Feb. 2002). But regardless, Nanyange's point in testifying about the rebels was that the local chairman was fabricating false accusations against her, and indeed the State Department's Country Report confirms that several Besigye supporters were falsely detained. U.S. Dep't of State, COUNTRY REPORTS ON HUMAN RIGHTS PRACTICES 2004 (Feb. 2005) (noting that "[a]rbitrary arrest and detention, including those of opposition supporters," remain a problem in Uganda). Nanyange's testimony about rebel groups was not a proper basis for deeming her testimony incredible.

The IJ's second reason for discounting Nanyange's testimony is similarly inadequate. He stated that Nanyange's testimony that her husband lived legally in Japan "defie[d] belief." He faulted her for not knowing the type of visa her husband had or how well he spoke Japanese. Although Nanyange and her husband spoke twice a month, the IJ's premise that he surely would have mentioned the type of visa he held or the names of the places he obtained subsistence labor seems doubtful. Nor did the IJ explain his reason for discounting Nanyange's explanation that she and her husband mainly spoke of their children, from whom they were separated, and that African men tend not to share their difficulties with their wives. Regardless, the details of Nanyange's husband's life in Japan have nothing to do with whether she herself suffered persecution in Uganda because of her political beliefs, and thus do not serve as a basis to deem her testimony incredible. *See Uwase*, 349 F.3d at 1043.

Similarly, the IJ's third reason for rejecting Nanyange's testimony does not concern the heart of her application. The IJ pointed to an inconsistency between Nanyange's statement in an INS interview that she had not sought medical treatment after her rapes and her hearing testimony that she had been visited in

her home by a doctor of traditional medicine.[2]   Because this doctor "issued antibiotics to her, which is hardly the sort of remedy that a faith healer or witch doctor could give her," the IJ apparently believed that Nanyange had simply fabricated the doctor's visit.  But the IJ did not substantiate his view that antibiotics are as strictly regulated in Uganda as they are here, nor did he articulate a reason for rejecting Nanyange's explanation that she had not thought of the visit from the doctor of traditional medicine as the sort of "medical treatment" about which the INS interviewer was inquiring.  Nanyange's explanation is not unreasonable in light of the disparities between the two forms of care in Africa, where over 80% of the population uses traditional medicine.  World Health Organization, WHO TRADITIONAL MEDICINE STRATEGY 2002-2005, *available at* http://www.who.int/topics/traditional_medicine/en/.  And regardless, it is Nanyange's detentions and rapes that form the heart of her claim, not any care she received subsequently.  Trivial inconsistencies do not constitute a valid basis for discrediting an alien's asylum claim. *Iao v. Gonzales*, 400 F.3d 530, 532 (7th Cir. 2004).

The IJ's final reason for disbelieving Nanyange is also trivial.  He faulted her for testifying that attorney Mugerwa twice facilitated her release from prison when Mugerwa's statement mentioned helping with only a single release.  He rejected Nanyange's explanation about learning from her sister that Mugerwa helped both times, stating simply that if Mugerwa had helped twice, "she should have made note of that in her statement."  But again, it is not how Nanyange obtained release after her rapes that matters, but whether she was detained and raped in the first place. Mugerwa's affidavit in fact *supports* Nanyange's basic claim that she was detained and raped in July and September 2001, which might in and of itself establish persecution.  *Tolosa*, 384 F.3d at 910-11; *Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1072 (9th Cir. 2004).  Nanyange's perceived failure to correctly recall details surrounding her release is of little relevance given the overall clarity of her account of the persecution itself.  *See Lin v. Ashcroft*, 385 F.3d 748, 755-56 (7th Cir. 2004) (IJ's "skepticism" about alien's claim that ten people accompanied her to a forced abortion did "not form a valid basis for a negative credibility determination" where account was otherwise corroborated).  We conclude that the IJ found Nanyange to lack credibility based solely on "trivial details" and "easily explained

---

[2] Of course, Nanyange's INS statement is not in the record, making it difficult for us to evaluate whether it was truly inconsistent with her hearing testimony. *See Matter of S-S-*, 21 I & N Dec. 121, 123-24 (BIA 1995) ("When, as in these asylum proceedings, the applicant's credibility is placed in issue because of alleged statements made at the asylum interview, our review requires a reliable record of what transpired at that interview.").

discrepancies." That decision, on this record, cannot be allowed to stand. *Korniejew*, 371 F.3d at 387.

Nanyange also argues that her testimony that she was twice detained and raped because of her support of a political candidate established that she suffered past persecution and would likely be persecuted in the future. As the government correctly points out, however, an alien's eligibility for asylum is a question that we leave for an IJ to decide as an initial matter. *See INS v. Ventura*, 537 U.S. 12, 16-17 (2002); *Tolosa*, 284 F.3d at 910-11.

Accordingly, we GRANT Nanyange's petition for review, VACATE the judgment of the IJ, and REMAND for a determination of Nanyange's eligibility for asylum. We recommend that Nanyange's petition, on remand, be considered by a different immigration judge.