**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois  60604**

Argued August 3, 2005
Decided October 20, 2005

**Before**

Hon. MICHAEL S. KANNE, *Circuit Judge*

Hon. DIANE P. WOOD, *Circuit Judge*

Hon. DIANE S. SYKES, *Circuit Judge*

No. 04-2221

| | |
|---|---|
| ALEKSANDER AGRAJA, <br> *Petitioner*, | Petition for Review of an Order of the <br> Board of Immigration Appeals |
| *v.* | No. A 78 927 570 |
| ALBERTO GONZALES, Attorney <br> General of the United States, <br> *Respondent.* | |

**O R D E R**

Aleksander Agraja is an Albanian citizen who is seeking asylum in the United States based on alleged political persecution he suffered at the hands of the Socialist Party government, which held power at the time he left Albania in early 2001. The IJ denied his application, and the BIA adopted that decision in a one-judge order that supplied additional reasons for rejecting Agraja's claim. Agraja's petition for review in this court presents two contentions that were exhausted before the BIA: first, that the IJ erred by discounting a purported medical record intended to corroborate Agraja's claim that Albanian authorities broke his leg during a politically motivated beating, and second, that the IJ erred by refusing to recognize his witness on Albanian political affairs as an expert. Because both evidentiary decisions fell within the bounds of discretion that the agency may exercise, and in any event neither one could have prejudiced Agraja, we deny his petition for review.

**I**

Agraja, who turned 24 just before departing Albania, waded across the Rio Grande in February 2001 from Mexico to Texas, but he was immediately intercepted on the Texas side by the U.S. Border Patrol. The former INS initiated removal proceedings, and exactly one year after his entry, Agraja applied for asylum. (He also sought withholding of removal and relief under the Convention Against Torture, but we have no need to discuss those points separately.) Agraja claimed in his application for asylum, which he completed with the assistance of counsel, that he suffered repeated detentions and beatings by the secret police after the Socialist Party (which he equates with the "communists") took power in early 1997 following the collapse of the Democratic Party government of Sali Berisha. The reason for his mistreatment, he asserted, was his political views. Agraja specifically recounted a severe beating he received in July 2000 in response to his support for democratic ideals, during which the police deliberately broke his right leg, which then became infected. He also claimed that his family had suffered persecution on the basis of their religion and social group for a lengthy period of time dating back to just after World War II, but his application and later testimony make nothing of the latter two grounds with respect to the time period after the 1997 change in governments.

At his removal hearing, Agraja testified that from 1997 through the incident in July 2000, agents of the communist-controlled secret police repeatedly imprisoned and beat him for attending Democratic Party demonstrations. Occasionally, they held him for periods ranging from two weeks to a month. During one especially harsh period of imprisonment, the secret police broke his leg and then dumped him at his home ten days later, after the untreated break had become infected. He reported that a doctor operated on the leg and inserted a metal bar, but the bar was removed five months later. To corroborate his story, Agraja presented a handwritten document that he obtained through the mail from an uncle who still lives in Albania, which supposedly was from the hospital where the procedure was performed. The unauthenticated English translation reflects that Agraja entered the hospital on July 12, 2000, with the Latin diagnosis "[c]ontusio tramatica geni dex. et fractura maleoli let" (which roughly translates to a traumatic contusion to the right knee and a fractured ankle), and that at some point was operated on with a "slab and screw." The document adds, without elaboration, that a "materials drawing" was made on December 7, 2000. But the document offers no insight into how Agraja injured his leg. After this procedure, Agraja fled Albania because he feared being beaten again or killed.

Upon cross-examination, Agraja admitted that he lacked corroborating evidence of his involvement in the Democratic Party, and that neither his parents (both then in the United States on visitor visas) nor any of his six siblings (one living in the United States, two in Italy, one in England, and the other two still in Albania) had provided an affidavit or even a letter to support his claim of persecution. Agraja admitted that he did not even tell his parents about the asylum hearing, even though they were

staying a few hours away in Michigan. He testified further that he departed Albania with what he believed to be a valid visa to enter the United States, and that only after traveling through several countries and entering by way of Mexico did he discover the visa to be a fake.

In addition to Agraja, the IJ heard testimony from Prenk Camaj, who Agraja was trying to use as an expert on the history, political climate, and interactions of the political parties in Albania. But the IJ concluded from studying Camaj's curriculum vitae that he lacked the "academic preparation" and "publications" to qualify as an expert. This meant that the IJ gave Camaj's testimony only the weight that would be afforded to any lay witness.

In denying Agraja's application, the IJ found that his claim was "completely unsupported," and that his "testimony alone" was "insufficient to establish the factual proposition on which his case relies." The IJ thought it suspicious that family members living in the United States would not have attempted to support Agraja's claim by backing his account of his experiences or testifying about their own. The IJ also characterized Agraja's medical record as "unreliable and unauthenticated" because it is not drafted on hospital stationery, because the authoring doctor's signature is not authenticated, and because it is "not fully translated" (only the parts written in Albanian were translated; the Latin diagnosis was simply repeated *verbatim* in the translated version – exactly as we have just used a Latin word here).

Agraja appealed to the BIA, claiming that his due process rights were violated when the IJ rejected Camaj as an expert witness and refused to credit the medical document. In adopting the IJ's decision, the BIA pointed out that "[e]ven if the respondent's witness was recognized as an expert and even if his medical certificate had been fully credited, the respondent would still have failed to meet his burden of proof." The BIA reasoned that neither Camaj nor the purported medical record lent any support to Agraja's testimony that he actually was a member of the Democratic Party or that the broken leg came at the hands of the secret police.

## II

In this court, Agraja focuses entirely on political persecution. The overlapping contentions in his brief are difficult to parse; three of the four "issues" he identifies speak in terms of denials of "due process" and "fundamental fairness," but in essence the argument section of the brief makes four conventional arguments: (1) the IJ never made an explicit credibility finding; (2) the IJ erroneously discounted the corroborative value of the medical record; (3) the IJ wrongly refused to recognize Camaj as an expert; and (4) the BIA, by issuing a one-judge order adopting the IJ's decision, did not engage in meaningful review. *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003), resolved the last point against Agraja, and we have no inclination to revisit that decision. As we regularly do, we will review the IJ's decision here, as supplemented by

the BIA. *Zheng v. Gonzales*, 409 F.3d 804, 809 (7th Cir. 2005). We therefore turn to his other three points.

## A. Credibility

The problem with Agraja's complaint that the IJ failed to make an explicit credibility determination is that he has raised this point for the first time in his petition for review. Agraja's failure to present the issue to the BIA means, as the government has argued in this court, that Agraja has waived this argument. See 8 U.S.C. § 1252(d)(1); *Mojsilovic v. INS,* 156 F.3d 743, 748 (7th Cir. 1998). We therefore have no further comment on the adequacy of the IJ's treatment of the credibility issue.

## B. Medical Record and Expert Testimony

What remains are Agraja's exhausted arguments that he was denied due process when the IJ failed to give any weight to the medical record he proffered and refused to recognize Camaj as an expert witness. The IJ's concern about the medical record's lack of authentication was valid, see *Georgis*, 328 F.3d at 969 (requiring authentication of documents introduced in immigration proceedings through any recognized procedure), and was enough in itself to support the judge's decision to exclude it. (Our view might have been different if the exclusion had rested only on the fact that the Latin diagnosis was not translated. Does this mean that the Supreme Court needs to provide interpreters when it refers to writs of *certiorari*? Would this also necessitate an officially certified Latin interpreter, if there are any left outside of the Vatican, to interpret a phrase like *res ipsa loquitur* or *expresio unius est exclusio alterius* if it shows up in a French-language legal document? Fortunately, the IJ's aversion to Latin had no practical effect on the present case, given the serious problem with authentication.)

The IJ may have imposed an unduly high standard on Camaj, given the fact that there is no hard-and-fast rule that a witness must write books or publish academic articles on the subject matter of his or her testimony in order to qualify as an expert, *Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004), and the fact that Camaj had testified as an expert in other immigration cases, see *Hysi v. Gonzales*, 411 F.3d 847, 850 (7th Cir. 2005). On the other hand, it is not necessarily a compliment to be known as a professional witness (if indeed one could say this of Camaj), and an asylum applicant recently accused Camaj of unethical conduct in another circuit, though that court never decided whether the accusation was well founded. See *Sinistaj v. Ashcroft*, 376 F.3d 516, 517-18 (6th Cir. 2004) (noting that petitioner accused Camaj of fraudulently holding himself out as qualified to represent aliens before the INS and erroneously advising alien to submit false and inconsistent information to the Service).

In the end, even if both evidentiary rulings can be faulted, the BIA reasonably concluded that Agraja could not have been prejudiced by either one. *See Podio v. INS*,

153 F.3d 506, 511 (7th Cir. 1998) (observing that petitioner complaining about IJ's refusal to entertain witness testimony must show that excluded testimony had potential to affect outcome). The BIA correctly pointed out that, even taking Agraja's medical document at face value, it does nothing to link his injury to the Albanian authorities or the claimed persecution. At best the document shows that his leg was in fact broken and operated on. Likewise, not affording Camaj the status of expert did not prejudice Agraja. The IJ heard everything Camaj had to say, albeit as a lay witness. Camaj's testimony related to the political climate in Albania, specifically the relations among the political parties. Even without deeming Camaj an expert, the IJ accepted the fact that the police in Albania often abuse detainees. Nonetheless, because the IJ rejected Agraja's claim that he was a member of the Democratic Party, nothing Camaj said and nothing about his status could have salvaged Agraja's case.

For these reasons, we DENY the petition for review.