# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2757

ABEL MEHARI NIGUSSIE,

*Petitioner*,

v.

JOHN D. ASHCROFT, as Attorney General
of the United States, and BUREAU OF
CITIZENSHIP & IMMIGRATION SERVICES,

*Respondents.*

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A77 297 793

_____

ARGUED FEBRUARY 26, 2004—DECIDED SEPTEMBER 1, 2004

_____

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I. History

On March 5, 2000, Abel Mehari Nigussie, an Ethiopian citizen of allegedly Eritrean origin, entered the United States as a nonimmigrant using a fraudulent passport. He was de-tained at the Los Angeles International Airport and inter-

viewed by an Immigration and Naturalization Service[1] ("INS") officer and found to be inadmissible. On April 4, 2000, the INS issued Nigussie a Notice to Appear, charging that he procured entry into the United States by fraud or by willfully misrepresenting a material fact under 8 U.S.C. § 1182(a)(6)(C)(I) of the Immigration and Nationality Act ("Act"). The Notice to Appear also charged that Nigussie violated § 1182(a)(7)(A)(i)(I) as an immigrant not in possession of required suitable travel documents.

Through counsel, on July 31, 2000, Nigussie moved to change venue from Los Angeles to Chicago. Nigussie admitted the factual allegations contained in the Notice to Appear and conceded the charges of deportability, but refused to designate a country of deportation. In his change of venue motion, Nigussie declared his intent to file for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") in Los Angeles granted Nigussie's motion for change of venue on August 2, 2000. On April 25, 2001, more than a year after arriving in the United States, Nigussie filed his application for asylum, withholding of removal, and relief under the CAT in Chicago.

In an evidentiary hearing on January 7, 2002, before an IJ in Chicago, Nigussie again admitted and conceded the charges against him and refused to designate a country of removal. On that same day, the IJ issued a decision denying Nigussie's application for asylum, finding it untimely under 8 U.S.C. § 1158(a)(2)(B) because he filed it more than one year after entering the United States and because he failed to demonstrate changed or extraordinary circumstances justifying an extension of the deadline under § 1158(a)(2)(D).

---

[1] On March 1, 2003, the enforcement functions of the INS were transferred to the Department of Homeland Security pursuant to Section 441 of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (Nov. 25, 2002).

In an alternative holding, the IJ addressed Nigussie's asylum application on its merits and denied it because of Nigussie's lack of credibility and the absence of corroborating evidence. The IJ also denied Nigussie's application for withholding of removal and relief under the CAT based on the same adverse credibility finding.

On January 28, 2002, Nigussie appealed the IJ's decision, asserting that the IJ failed to consider evidence in his favor and that the court caused the delay in filing the application for asylum. Under its streamlining procedure, 8 C.F.R. § 1003.1(e)(4), the Board of Immigration Appeals ("BIA") affirmed the results of the IJ's decision without opinion on June 9, 2003. This petition for review followed wherein Nigussie challenges the IJ's untimeliness finding and his determination on the merits as to Nigussie's application for asylum, withholding of removal, and relief under the CAT. For the following reasons, we deny Nigussie's petition for review.

## II. Analysis

### A. Asylum Application

We lack jurisdiction over the BIA's decision to bar, based on untimeliness, Nigussie's asylum application. As we recently decided in *Zaidi v. Ashcroft*, No. 03-3062, 2004 U.S. App. LEXIS 15359 (7th Cir. July 26, 2004), the plain language of § 1158(a)(3) of the Act prohibits our review of such matters. *Id.* at *6 ("We now join our sister circuits in holding that the 'no court shall have jurisdiction to review' language of § 1158(a)(3) is sufficiently specific to show that Congress intended to preclude judicial review of agency action under § 1158(a)(2)."); *see also Vladimirova v. Ashcroft*, No. 03-1852, 2004 U.S. App. LEXIS 15357, at *13 (7th Cir. July 26, 2004).

Although we may not consider the merits of Nigussie's asylum claim, § 1158(a)(3) does not bar our review of his application for withholding of removal or relief under the

CAT. *See Zaidi*, 2004 U.S. App. LEXIS 15359, at \*7-8 (citing 8 C.F.R. § 208.3(b) and *Niam v. Ashcroft*, 354 F.3d 652, 654 (7th Cir. 2004)); *Vladimirova*, 2004 U.S. App. LEXIS 15357, at \*14; *Tarawally v. Ashcroft*, 338 F.3d 180, 185-86 (3d Cir. 2003).

### B. Withholding of Removal and CAT Claims

To succeed on his withholding of removal claim, Nigussie must establish a "clear probability" that he will suffer persecution if returned to his home country. *Zaidi*, 2004 U.S. App. LEXIS 15359, at \*7 (citing *Niam*, 354 F.3d at 654). If Nigussie can establish that he was persecuted in the past, there is a presumption, subject to rebuttal by the Government, that the persecution will continue upon his return. *Id.* (citing 8 C.F.R. § 208.16(b)(1)(i)).

Under the CAT's implementing regulations, "the burden of proof is on the applicant to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Torture, as defined by the CAT, means:

> [A]ny act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 208.18(a)(1); *see also* 8 C.F.R. § 208.18(a)(4) (defining under what circumstances "mental pain or suffering" may constitute torture).

When a petition is streamlined, as is the case here, the IJ's decision becomes that of the BIA. *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003). Thus, judicial review is limited to the decision of the IJ. *Krouchevski v. Ashcroft*, 344 F.3d 670, 671 (7th Cir. 2003).

The IJ's determinations with regard to Nigussie's application for withholding of removal and relief under the CAT are both reviewed under the "substantial evidence" standard. *See Oforgi v. Ashcroft*, 354 F.3d 609, 615 (7th Cir. 2003). Under this highly deferential standard of review, we must affirm the IJ's findings if supported by "reasonable, substantial, and probative evidence." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 and n.1 (1994); *Awad v. Ashcroft*, 328 F.3d 336, 341 (7th Cir. 2003). We will not overturn an agency's determination unless the evidence compels that contrary conclusion. *Elias-Zacarias*, 502 U.S. at 481 and n.1; *Krouchevski*, 344 F.3d at 673.

Here, the IJ rejected Nigussie's claims because he found Nigussie lacked credibility and failed to provide corroborating evidence supporting his application. An IJ's credibility determinations also receive "highly deferential" review as long as they are well-reasoned. *Pop v. INS*, 270 F.3d 527, 530-31 (7th Cir. 2001). *See generally Nasir v. INS*, 122 F.3d 484, 486 (7th Cir. 1997). That is, the credibility determinations must be supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999) (quotations omitted); *see also Krouchevski*, 344 F.3d at 673. An agency's credibility findings should not be superseded "simply because an alternative finding could also be supported by substantial evidence." *Ahmad*, 163 F.3d at 461. In sum, an IJ's credibility determination should only be overturned under "extraordinary circumstances." *Id.*

### 1.  Nigussie's Evidentiary Hearing Testimony

In his January 7, 2002 merits hearing before the IJ in Chicago, Nigussie testified that he was a native of Ethiopia. His parents, however, were born in Eritrea. He, like them, was an Orthodox Christian and then converted to the Jehovah's Witness faith in 1989. His mother is dead, and he has two surviving brothers and three sisters, at least four of whom still live in Ethiopia. The fifth sibling, a sister, is apparently in Kenya.

Nigussie testified that at the start of the Eritrean-Ethiopian war in May of 1998,[2] many ethnic Eritreans were rounded up and taken during the night by Ethiopian security agents; Nigussie's father was one of them. He has not seen his father since and does not know of his whereabouts. After his father's arrest, government functionaries brought Nigussie utility bills that his father owed to ensure payment before his father's deportation. Fearing arrest if he went to pay the bills, he did not do so and does not know if his siblings did either.

Nigussie then voluntarily left Ethiopia for Kenya. While on his way to Kenya, police detained Nigussie in Yabelo, Ethiopia. He was imprisoned for thirty-nine days. After-

---

[2]  According to the U.S. Department of State's Country Reports on Human Rights Practices for the year 2000, submitted by the Government at Nigussie's hearing, a war broke out between Ethiopia and Eritrea in May of 1998. In June of 2000, Ethiopia and Eritrea signed a cessation of hostilities agreement, and on December 12, both countries signed a formal peace treaty. Prior to that time, at least 75,000 people of Eritrean ethnicity left Ethiopia for Eritrea, although the vast majority were forcibly deported. With the peace accord, the government stopped deporting Eritreans and Ethiopians of Eritrean origin; it is now estimated that more than 200,000 Eritreans and Ethiopians of Eritrean origin remain in Ethiopia. *See* http://www.state.gov/g/drl/rls/hrrpt/2000/af/789.htm.

wards, the authorities deported Nigussie to Moyale, Kenya,[3] but did not send him to a refugee camp. It appears from his testimony that he was allowed to cross the border into Kenya, whereupon Kenyan police arrested him. He was then detained for a couple of days in a jail, but again not sent to a refugee camp, because, according to Nigussie, there was no immigration office in Moyale. After his release, he was told by authorities to stay in Moyale.

While in Moyale, Nigussie states he met "a girl," and the two traveled to Nairobi. In Nairobi, immigration officials seized Nigussie's Ethiopian passport and forced him to sign a statement renouncing his Ethiopian citizenship. Although he remained in Kenya for eighteen months, Nigussie refused to register voluntarily with refugee camps because he believed the Kenyan government was unwilling to help refugees relocate to other countries like the United States. Nigussie paid $400 to secure an Eritrean passport that allowed him to procure a renewable three-month Kenyan tourist visa. With money he procured from work as an automobile mechanic and from a close friend of his mother's who lives in Norway (she was referred to as a "sister"), he paid a Somali smuggler $5000 to travel from Kenya to Hong Kong

---

[3] He was not deported to Eritrea, because, according to Nigussie, the Ethiopian government feared that if it sent young people to Eritrea they would be trained as soldiers to fight Ethiopia. The IJ doubted this aspect of Nigussie's case because he believed that the authorities would have known that the tenets of the Jehovah's Witness faith, which Nigussie professed to practice, forbade him to participate in warfare, thus eliminating him as a threat if deported to Eritrea. Although the IJ's decision is otherwise well-reasoned and supported by substantial evidence, we note that this conclusion is flawed. Ethiopia does not persecute Jehovah's Witnesses, but Eritrea does. *See Muhur v. Ashcroft*, 355 F.3d 958, 959 (7th Cir. 2004). Thus, if deported to Eritrea, Nigussie may well have chosen *not* to declare himself a conscientious objector based on his faith in order to avoid religious persecution.

and then the United States, where Nigussie entered the country with invalid legal documents.

Because he renounced his Ethiopian citizenship under duress in Kenya, he explained to the IJ that, if deported, he feared that Ethiopia would not accept him. He also claimed that if he did return to Ethiopia, he would be killed, imprisoned for life, or deported to Eritrea because of his Eritrean ethnicity. Contrary to his sworn statement taken before the immigration officer in Los Angeles, Nigussie contended that his application was not based on his religion, Jehovah's Witness, or on his reluctance to fight in the Eritrean-Ethiopian war, but rather on the repercussions that would result in Ethiopia from his Eritrean ethnicity.

In his determination denying Nigussie's application for withholding of removal and relief under the CAT, the IJ cited several reasons why Nigussie failed to present himself as a credible witness and prove himself eligible for withholding of removal or relief under the CAT. We describe each in turn below.

### 2. Basis for IJ's adverse credibility determination

First, the IJ disbelieved certain details with respect to Nigussie's flight from Ethiopia to Kenya. For example, once in Kenya, Nigussie represented that the Kenyan police who detained him in Moyale neither required him to go to a refugee camp nor be processed by immigration officials. Instead, they released him, then told him not to leave and to check back with them periodically. The IJ found Nigussie's testimony regarding his detention in Moyale incredible, as he noted that Kenyan authorities usually place those persons fleeing Ethiopia in refugee camps.

Second, the IJ noted several discrepancies between Nigussie's statement to the asylum officer in Los Angeles and his testimony at his evidentiary hearing. For example,

in his Los Angeles statement, Nigussie asserted that the passport on which he was traveling was his, yet at the hearing, he testified that it was fraudulent. Nigussie also declared in his Los Angeles statement that his true purpose for seeking admission into the United States was to seek asylum for fear of persecution because of his religion, Jehovah's Witness, and because he "[did] not want to fight in the war that is going on between Eritrea and Ethiopia." Yet, neither in his asylum application nor during his testimony at the hearing did Nigussie ever establish that he had been previously persecuted or abused in Ethiopia based on his religion or objection to the war, or claim that he was seeking to remain in the United States because of any fear of religious persecution or punishment for refusal to fight at home. Instead, he based his asylum application and request for withholding of removal and relief under the CAT on his ethnicity alone, fearing abuse at the hands of the Ethiopian government because of his Eritrean ethnicity.

Third, the IJ noted inconsistencies in Nigussie's claim that he is a Jehovah's Witness. Nigussie failed to provide any evidence supporting his claim that he is a practicing Jehovah's Witness in the United States, such as any documents or testimony from the elders or parishioners of any Kingdom Hall in Chicago. Further, Nigussie presented no admissible documents or other evidence verifying the practice of his Jehovah's Witness faith in Ethiopia.

Fourth, the IJ noted that Nigussie's behavior at the evidentiary hearing "was very evasive in his presentation and in his demeanor," and that Nigussie failed to respond to questions directly.

Finally, the IJ observed that Nigussie failed to provide corroborating evidence to support his status, ethnicity, or any of his other histories. He presented no documents or witnesses to verify the ethnic background of his parents, except to assert, without any support, that their names—Mehari

and Eyasu—are common Eritrean names. As already mentioned above, he supplied no documents or witnesses to prove that he was baptized as a Jehovah's Witness or that he practices his faith in Chicago. He presented no evidence of detention in Yabelo or Moyale, or his eighteen-month stay in Kenya. No part of his story was corroborated, despite the fact that he claimed to have a relative in Chicago, a relative in Los Angeles, and a "sister" in Norway, none of whom appeared in person, by telephone, or by affidavit in his support.

In sum, the only evidence Nigussie offered was his own self-serving statements. Due to the inconsistencies and lack of corroborating evidence, the IJ determined that Nigussie did not testify credibly, and thus failed to prove that he suffered past persecution in Ethiopia based on his ethnicity. The IJ also determined, again because of the lack of credible, corroborated testimony, that Nigussie failed to demonstrate, as is his burden, that future persecution based on his ethnicity would be a clear probability if returned to Ethiopia or that he would more likely than not be subject to torture.

### 3. The IJ's decision is supported by substantial evidence

We agree that the IJ's adverse credibility determination was warranted and that the denial of Nigussie's application for withholding of removal and relief under the CAT was proper. Based on our review of the record, the IJ's observations with regard to the internal inconsistencies exhibited by Nigussie's hearing testimony is based on substantial evidence, as is the concern with regard to Nigussie's shifting claims of asylum, which changed dramatically between the time he first entered this country claiming primarily religious persecution and his asylum application based wholly on his ethnicity.

The IJ's observation that he generally found Nigussie's demeanor at the evidentiary hearing to be "evasive," indi-

cating a lack of credibility, is one we cannot fully appreciate based on the cold record before us. Considering the deference due to the IJ's credibility determinations, we find no reason to disturb this conclusion in this case.

While we observe that a claim for withholding of removal or withholding of removal under the CAT need not be supported by corroborating evidence if the applicant is credible, see 8 C.F.R. § 208.13(a), "when the IJ does not believe the applicant or does not know what to believe, the applicant's failure to corroborate his testimony can be fatal" to his claims for relief. *Zaidi*, 2004 U.S. App. LEXIS 15359, at *9 (quotation omitted) (citing cases). Because Nigussie's testimony, standing alone, was not credible because of the inconsistencies and observations noted above, we agree with the IJ that corroborating evidence, in the form of documentation and other witness testimony, was necessary for Nigussie to adequately support his claims. Yet, Nigussie provided none, though many of the facts alleged in support of his application were subject to easily obtained verification.

Nigussie argues that the IJ was wrong to criticize the lack of evidence supporting his testimony that he belonged to the Jehovah's Witness faith and from there posits that the IJ misapprehended the basis for his asylum claim. We note that it is clear from the IJ's decision that he fully understood Nigussie to be claiming relief based on his ethnicity alone, but that he considered Nigussie's testimony, and lack of corroboration, as to his faith to be pertinent to Nigussie's overall credibility. We agree and concur that Nigussie's inability to substantiate his professed faith, as with so many other details of his life, appropriately contributed to the adverse credibility finding.

In sum, Nigussie's testimony, the only evidence before the IJ, was self-serving, inconsistent, and lacking in credibility and corroboration. The IJ's conclusion that Nigussie did not

sustain his burden of proof on either his withholding of removal or CAT claims was therefore supported by substantial evidence.

### III.  Conclusion

For the foregoing reasons, Nigussie's petition for review is DENIED.

A true Copy:

    Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*