# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-2889

ZIGMEY LHANZOM,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A79-587-384

ARGUED APRIL 7, 2005—DECIDED DECEMBER 5, 2005

Before MANION, ROVNER and SYKES, *Circuit Judges.*

ROVNER, *Circuit Judge.* Zigmey Lhanzom is a Tibetan Buddhist who sought asylum in the United States as well as withholding of removal and relief under the United Nations Convention Against Torture ("CAT"). The immigration judge ("IJ") found that Lhanzom missed the deadline for filing an asylum claim and failed to meet the criteria for withholding of removal or relief under CAT. He therefore denied her claim in full and ordered that she be removed to the People's Republic of China. The Board of Immigration Appeals ("BIA") affirmed, without opinion, the decision of the IJ. Lhanzom petitions for review and we grant the petition in part, dismiss it in part, and remand for further proceedings consistent with this opinion.

**I.**

Lhanzom was born in Tibet in 1964. The People's Republic of China (hereafter "China") invaded and annexed Tibet in 1949 and has occupied Tibet since that time. Tibet currently is considered part of China and Lhanzom is therefore considered a citizen of China. In 1957, Lhanzom's father, Sedan Khampa, joined a Tibetan military resistance group called Chushr Gangdruk. As a member of Chushr Gangdruk, Khampa fought against the Chinese government primarily in an area of eastern Tibet called Kongo. The fighting took him at times into Nepal and at times back into Tibet. He had limited contact with his family during that time, meeting up with his wife on occasion. In 1965, a year or so after Lhanzom was born, Khampa and his wife escaped to Nepal, leaving Lhanzom and her older sister, Tseyyang, with relatives in Tibet. Khampa and his wife later settled in Sikkim in India. They resided in Sikkim from 1966 until 2002. In 2002, Khampa and his wife moved to the United States where another daughter had obtained citizenship.

According to her testimony before the IJ, Lhanzom and Tseyyang had been left in the care of their uncle and his wife. Her uncle, Gampal, was a lama, a Tibetan Buddhist monk. Because his brother was a resistance fighter and because he was a lama, Gampal was eventually arrested by the Chinese government and imprisoned along with Tseyyang. Gampal's home was ransacked and he was beaten. Lhanzom fled to Chamdo (a city in Tibet) when this happened, and went into hiding. Gampal and Tseyyang died in prison in 1986 as a result of beatings and other mistreatment. Lhanzom was subsequently taken to a labor camp near Chamdo where she spent the next two or three years. In the labor camp, she was forced to work on road construction during the day and subjected to Communist propaganda at night. Her captors demanded that she renounce the Dalai Lama, the ruler and chief monk of Tibetan

Buddhism, and threatened to beat her if she did not comply. At times, when she did not comply with their demands, government agents forced her to stand and bend down for hours and hours, and beat her on her back. Lhanzom was 22 or 23 when the government placed her in this labor camp. Two or three years later, in 1989, there was a relaxation of government policy against Tibetan Buddhists and Lhanzom was among a number of people released from the labor camp. She reported that she was released because she was weak and ill and therefore unable to do much work. On her release, she went to live with another uncle in Rioche (another city in Tibet). There she married Nima Dhondup. This uncle, who was also a lama, had also spent considerable time in prison and was in a weakened condition. He died a short time after Lhanzom's arrival in Rioche. After her uncle died, Lhanzom and her husband went on a pilgrimage to Lhasa, the capital of Tibet. During the journey, Dhondup, who had been in poor health because of his time in prison, became ill with food poisoning and died.

Lhanzom, now without family and with no place to go, stayed in Lhasa and began participating in demonstrations against the Chinese government. She was promptly arrested and was held for three days. On her release, she met up with friends who were willing to help her escape to Nepal. In Lhanzom's own words (as translated at her hearing):

> The journey took whole month because during the daytime we hid, sleep, and then at night-time we escape. On the way we suffered tremendous stress, pain, and, you know, from hunger because during those days, it was very cold. There were snowy mountains, there were big mountains to cross, and there was lack of food so we were most of the time hungry and I wondered if I would ever reach Nepal and see other

> people, my family or whoever, but thanks to God, finally I was able to reach there.

R. at 66.[1] Once in Nepal, Lhanzom set about the task of tracing her remaining family members. With the help of the Gyatutsang family, she was able to find her father in Sikkim in India. Although Sikkim was home to many long-time Tibetan refugees, the government there was much more suspicious of new arrivals and had a policy of deporting new refugees. To avoid deportation, Lhanzom's father took her first to Dharamsala, a town in northern India which is the home of the Tibetan government-in-exile. Lhanzom stayed in Dharamsala for a few months but its distance from Sikkim made it difficult to visit her family so she moved to Darjeeling, which is a four-hour drive from Sikkim. In Darjeeling, Lhanzom worked as an assistant cook at Sonada, a Tibetan monastery. She estimated that she worked at Sonada from 1991 to 1996. During that time, she participated in political activities, including marches and demonstrations in both Darjeeling and Sikkim. These activities were protests for Tibetan freedom, demanding that China leave Tibet and restore its independence. During this time, Lhanzom joined the Tibetan Youth Congress and the Tibetan Women's Association, explaining that her political activities and memberships centered around Darjeeling and Sikkim rather than Dharamsala because she was in Dharamsala for only a brief period. Although the Indian government did not persecute Lhanzom, she had few rights in India and was unable to obtain any particular registration or papers from the government. Her only identification documents came from the Tibetan government-in-exile. She had no hope of being granted asylum in India given that, even her parents, who had

---

[1] We take judicial notice that the Himalayan Mountains separate Tibet from Nepal.

resided there for more than thirty years, were unable to obtain asylum.

In the meantime, one of Lhanzom's sisters had become a citizen of the United States when the U.S. government conducted a lottery allowing one thousand Tibetan families to immigrate here. Because Lhanzom had no recognized government papers allowing her to come to the United States, she went to Nepal and purchased a false passport which, in combination with a sponsorship letter from her sister, allowed her to travel to the United States in 1997. She arrived in Chicago on October 25, 1997. At first, she came on a tourist visa but later applied to school and transferred to a student visa. Before her student visa expired, she applied for asylum. While studying in the United States, Lhanzom continued to participate in political activities to protest China's occupation of Tibet. She attended demonstrations every March 10, which marked Uprising Day, the day that Tibetans first resisted the Chinese occupation. She participated in various demonstrations in New York, Washington and Chicago, protesting the Chinese occupation of Tibet. During a demonstration at the Chinese consulate in Chicago, Lhanzom noticed people inside the consulate taking photographs of the demonstrators.

In support of her claim, Lhanzom presented documentary evidence at her hearing before the IJ. She presented pictures of herself at various demonstrations in Nepal, Delhi, Chicago, and Washington D.C. She also presented a resident identification card from the Peoples Republic of China that she received when she was nineteen or twenty years old. She submitted a birth certificate from the Tibetan Welfare Office in Sikkim, explaining that no birth certificates were issued in Tibet itself and that the Indian government would not provide one either. The Tibetan government-in-exile issued the birth certificate after her father certified that Lhanzom was his daughter. She

presented an identification document issued by the State of Himachal Pradesh, which an Indian friend helped her obtain. Finally, she submitted an identification document from the Tibetan Youth Club in Gangtok, Sikkim, and a green card from the Tibetan Welfare Office. When asked what would happen if she returned to Tibet, Lhanzom stated that she feared she would be imprisoned or executed because of her personal involvement in demonstrations against the Chinese government and because of her father's participation in Chushr Gangdruk.

Under cross-examination, Lhanzom again confirmed that her Nepalese passport was a fake, purchased from agents in Nepal who trafficked in counterfeit documents, a fact Lhanzom had not hidden. She described how she took the fake Nepalese passport to the U.S. embassy, along with the sponsorship letter from her sister, Dawa Dolma, who had obtained citizenship in the United States. She explained that it was impossible for her to get a Chinese passport without going back to Tibet and risking prison or death. She testified that when she first came to the United States, she did not know asylum was even a possibility but learned about it through Tibetans she met here. She spent much of her first year in the United States ill, unable to adapt to conditions here. According to Lhanzom, she delayed in filing her asylum application because of illness and misinformation about the process. Moreover, she did not have the necessary papers, having taken few things with her when she left Nepal. Friends in the U.S. gave her conflicting advice about filing such a claim and she saw the situation as hopeless until she obtained more accurate information. She filed her first asylum application on August 27, 2001.

Lhanzom's father, Sedan Khampa, also testified at her hearing. Khampa testified that he joined the military group Chushr Gangdruk in 1957 in order to fight the Chinese invasion of Tibet. He fought the Chinese because China

persecuted Tibetans for their Buddhist religious beliefs. He described the persecution and imprisonment of family members that occurred as a result of the Chinese invasion. He described his wife's escape from Tibet across the Nepal border in 1965, leaving their two daughters in the care of relatives in Tibet. He confirmed that he and his wife settled in Sikkim in India and lived there from 1966 until coming to the U.S. in 2002. In 1990, he heard from friends that his daughter Lhanzom had come to Nepal. When asked if he knew what had happened to family members he left behind in Tibet, he replied that he heard what happened to his family from Lhanzom.

After the government cross-examined Khampa, the IJ questioned the seventy-nine year old Khampa at length, and the misunderstandings that are inevitable when questioner and witness speak very different languages abound in the record. For example, the IJ questioned Khampa about moving to Nepal in 1965, when Khampa had never testified that he moved to Nepal. Khampa testified that he went to Nepal in 1965 to meet up with his wife but did not stay long there. On another occasion, when Lhanzom's attorney tried to correct the IJ's misunderstanding about the location of Sikkim, the IJ responded with unusual defensiveness:

| IJ: | So then from 1965 until one year ago, you spent that time where? |
|---|---|
| Khampa: | So I left that resistant movement in 1965 since I heard that my wife has come so I left that place and joined my wife. |
| IJ: | Where did you go then? Did you stay in— |
| Khampa: | I did not stay much inside Nepal. We entered inside India. |
| IJ: | Well, you had said that you had gone to Sikkim which is a mountain kingdom. Did you go to Sikkim? |

Khampa:        At that time, resistant movement was
               disintegrating. Some were going there
               and some were just all over and I tried to
               enter with my wife into India.

Mr. Hagan:     Your Honor, can I—

IJ:            No, don't interrupt him, please.

Mr. Hagan:     I'm suggesting a question.

IJ:            No, I don't want you to suggest anything,
               please.

Mr. Hagan:     I believe Your Honor has a misapprehen-
               sion.

IJ:            Well, I don't, sir. I don't interrupt you
               with your questions. I'm trying to get—

Mr. Hagan:     I'll redirect then, Your Honor, when I get
               a chance.

IJ:            Well, I haven't promised you a chance to
               do that. I already did offer you that op-
               portunity earlier.

R. at 105-06. Undoubtedly, Mr. Hagan was trying to inform
the IJ that Sikkim is not a "mountain kingdom" as the IJ
erroneously stated but rather is a state in India. In fact,
Sikkim had ceased to be a kingdom and had become an
Indian state in 1975. Thus, the testimony that Khampa and
his wife went to India was not, in fact, inconsistent with his
statement that they went to Sikkim. Unfortunately, the IJ
repeated this error of geography when he found Lhanzom
testified inconsistently about her departure to the United
States, as we will later detail.

   Although Khampa had testified that he knew about his
daughter's life in Tibet only from talking to her after she
escaped in 1990, the IJ nonetheless questioned Khampa
extensively about Lhanzom's life in Tibet. The IJ asked

Khampa why his daughter left Tibet, and Khampa replied that the relatives who had cared for her died and that she had nowhere to stay. The IJ considered this an impeachment of Lhanzom's story that she had been mistreated in Tibet, remarking that Khampa did not mention anything happening to Lhanzom in Tibet before her 1990 departure. A confused exchange followed during which Khampa tried to clarify that he was not in Tibet when these things happened to his daughter, that she knew best what had happened to her, and that he was making assumptions based on what he knew happened to Tibetans in general. Because this exchange was crucial to the IJ's finding that Lhanzom was not credible, we include it here:

IJ: [F]rom what you said, your daughter left Tibet because her relatives died, not because she was being mistreated in 1990. You didn't mention that anything happened to her before her departure in 1990. Why would there [sic] something happen to her in 2003?

Khampa: What she, we were separated, what she suffered in there and she knows best. She has suffered so much.

IJ: Well, sir, has she had any contact with the authorities, by that, authorities, I mean the Chinese police or military before she left in 1990?

Khampa: She has suffered under forced labor.

IJ: When did she experience forced labor, sir?

Khampa: It is not only my daughter but daughters and sons of all the families whose parents were involved in the resistant movement. I was involved in the resistant movement and our family was treated as reactionaries

by the Chinese, so reactionaries' families always suffer.

IJ:          But you're not answering my question. I hear what you're saying, sir, but what I'm asking you is when did, when was your daughter forced into slave labor? When? From what year to what year?

Khampa:   Chinese started cultural revolution in 1964 and during that time, all the youngsters suffered, including my daughter even though she was very young, but the older one also suffered so much.

IJ:          Okay, But you're still not, this is the third time I'm asking you the same question so I want you to really focus on the question. You said earlier that your daughter had to work in forced labor. What year was that and how long? When did she begin and when did she end?

Khampa:   Maybe she suffered around 1980 to 1990, and before that she was too young.

IJ:          So, for ten years she was working in forced labor?

Khampa:   Yes.

IJ:          According to her asylum application, she was born in 1964. Is that right? Was she born then?

Khampa:   Yes.

IJ:          So she was in a forced labor camp from when she was 20 to when she was 30? Excuse me, I'm sorry. When she was 16 to when she was 26?

Khampa:  Yeah, around that time, when she was around 15, 16, then they started.

IJ:      And so she was there until she was 26 about?

Khampa:  Yes.

IJ:      And why was she released in 1990? Why was she released in 1990?

Khampa:  1990 was an important point in her life because many of her relatives, including sisters have died and she has no where to go, she has to make a decision and then that's why she decided to leave.

IJ:      No, I didn't ask you that, sir. I ask you, you said that she was in a forced labor camp until 1990, why was she released in 1990 after 10 years by the Chinese authorities?

Khampa:  It is not leaving, it is escaping.

IJ:      She escaped in 1990?

Khampa:  Yes.

IJ:      Okay. Then she left and went and joined you in Nepal? She did?

Khampa:  Yes.

IJ:      Now, sir, would it surprise you if I told you then that your daughter has told us earlier that she was in a labor camp only two or three years, not 10 as you've told us?

Khampa:  To talk about time is difficult because, you know, they suffered there and I was not there to see the whole thing. They suffered for a very, very long time.

IJ:          But, sir, there is a substantial difference in time obviously between 10 years and two or three. How do you account for the fact that you said 10 and she says two or three?

Khampa:      My assumption was that, you know, after, since 19—, when she was 15 years old and I assumed that, you know, she is considered as adult, 15, 16, 17, and then, you know, all others have to undergo forced labor, therefore, I considered that, you know, that she had been suffering for a very long time.

IJ:          Sir, you said she escaped in 1990, however, your daughter when she testified said that she was let go by the Chinese officials in 1989 because she was so weak. Can you explain why your version and hers differ?

Khampa:      I'm old and I have very bad memory about the dates and things like that. I make mistakes, so I may have made mistakes because I was not there.

IJ:          So, could you be completely mistaken about whether she was in a labor camp at all?

Khampa:      I strongly know that, you know, she has suffered and not only that her sister and my other relatives all passed away under the suffering.

R. at 150-53. This dubious cross-examination continued even though Khampa had now told the IJ at least three separate times that he was not present in Tibet when these things happened to Lhanzom, that he was making assumptions about what happened to her based on what happened generally to Tibetan Buddhists under the Chinese occupation, and that Lhanzom knew best exactly what had happened to her and when. When he finished his question-

ing, the IJ excused Khampa and, as promised, did not give Lhanzom's attorney any opportunity to redirect and correct any of the misunderstandings that leap from the transcript pages. Lhanzom's attorney and government counsel were allowed to argue their respective positions to the IJ, who then recessed and returned with an oral decision.

The IJ began by noting that Lhanzom filed her asylum application on September 27, 2001 and had entered the United States in October 1997. Because Lhanzom did not meet the one year deadline for filing an asylum application, the IJ considered whether she established extraordinary circumstances that would justify the delay. The IJ concluded that Lhanzom failed to show extraordinary circumstances and failed to show she was in valid student status or other lawful status up until the filing of the asylum application. The IJ thus turned to Lhanzom's alternate claims for withholding of removal and protection under the CAT.

The IJ acknowledged that China in fact occupies Tibet and suppresses the practice of Tibetan Buddhism. The IJ concluded that Lhanzom proved she is Tibetan, but found that she misrepresented who she was when obtaining her passport and visa in Nepal. He found that Lhanzom's testimony was consistent with her father's testimony on the issue of Khampa's participation in the Tibetan resistance movement but that there were material differences in their testimony regarding Lhanzom's activities. He set forth these inconsistencies. First, in the statement Lhanzom filed with her application for asylum (hereafter "Pre-Hearing Statement"), she stated that she spent most of her youth in labor camps during the day and at re-education meetings in the evenings, from the time she could remember until 1989. In contrast, the IJ stated, in her testimony Lhanzom claimed she spent two or three years in a labor camp before her release due to weakness. The IJ found that Khampa's story was inconsistent with his daughter's statements

because he testified that she was in labor camps for ten
years before escaping. The IJ concluded that the accounts
differed as to the length of time she spent in labor camps
and the manner of her leaving custody.

The IJ also found inconsistencies in Lhanzom's account of
what happened to her and where she lived after she left
Tibet. In her Pre-Hearing Statement, according to the IJ,
she reported that she went to Dharamsala, joined the
Tibetan Women's Association and the Tibetan Youth
Association, and participated in a number of demonstra-
tions that generated much publicity. At her hearing, she
testified that she participated in demonstrations and
political activities in India without providing any detail. In
contrast, according to the IJ, her father testified that she
stayed in a monastery, never had contact with the police,
and left India because her sister was living in the United
States. The IJ also concluded that Lhanzom's documentary
evidence contradicted her testimony, including a letter from
the Tibetan Welfare Office stating that her last departure
from Sikkim was August 7, 1997, and a letter from the
Tibetan Youth Club stating that Lhanzom was a member of
the regional Tibetan Youth Congress of Gangtok, Sikkim
since 1993 and that during her stay in Sikkim, she was one
of the most active members.

The IJ considered these documents to be evidence that
Lhanzom lived in Sikkim rather than Darjeeling and
faulted her for claiming to have left for the U.S. from India
when the documents stated she left from Sikkim. The
IJ found that Khampa's testimony that his daughter stayed
in a monastery the entire time she was in Darjeeling
inconsistent with Lhanzom's testimony that
she participated in demonstrations:

> Clearly, there are material inconsistencies in these
> accounts. I find that the respondent and her witness
> have given inconsistent testimony on material issues in

this case, that is, the extent of her mistreatment by the Chinese authorities and her activities and whereabouts in India after she left in 1989 or 1990. There also are important inconsistencies between the documents and her claims. The documents indicate that she is a Nepalese. She claims she is from Tibet. Assuming that she is from Tibet, I believe she is, she has not provided an explanation of why she misrepresented her origins and citizenship as reflected in the visa, indicating she is Nepalese.

Oral Decision of the Immigration Judge, February 28, 2003 (hereafter "Oral Decision"), at 9; R. at 27. The IJ was not persuaded that the Chinese government was aware of Lhanzom's participation in demonstrations in Chicago and elsewhere, calling her claim pure speculation. The IJ rejected Lhanzom's claim that she would be mistreated, incarcerated and abused if she was returned to China, finding that she was not credible for the reasons he previously stated and finding that her father's actions against the Chinese were too remote in time and therefore unlikely to cause any retribution against her. The IJ thus denied Lhanzom withholding of removal or relief under the CAT. He denied her voluntary departure and ordered her removed to China. The BIA summarily affirmed the IJ's decision without issuing a separate decision. Lhanzom petitions this court for review of the IJ's order.

## II.

In her petition, Lhanzom argues that the IJ erred in finding that her testimony differed from Khampa's testimony in any material way. She also contends that she adequately proved her claim of past persecution and that her petition for asylum should therefore have been granted. She maintains that she presented sufficient evidence of a

well-founded fear of future persecution and that the IJ should have shifted the burden of proof to the government. Because the IJ made so many factual errors, she asks that the case be remanded to the IJ for a proper determination of the facts. In sum, she contends that she was entitled to asylum under the facts she proved at her hearing. She also appeals the IJ's denial of her claims for withholding of deportation and for protection under the CAT. The government contends that we lack jurisdiction to review the IJ's dismissal of Lhanzom's untimely asylum application. The government also argues that, if we do have jurisdiction, we must affirm because substantial evidence supports the IJ's conclusion that Lhanzom was not entitled to asylum. Finally, the government maintains that the IJ properly denied withholding of removal and protection under the CAT.

**A.**

We begin with the jurisdictional issue raised by the government. The government argues that because the IJ dismissed Lhanzom's petition for asylum for failure to meet the one year deadline, we lack jurisdiction to consider that claim. Generally, asylum applications must be filed within one year after the date of the alien's arrival in the United States. *See* 8 U.S.C. § 1158(a)(2)(B). Notwithstanding the one year deadline, an asylum application may be considered if the alien demonstrates either the existence of changed circumstances which materially affect the applicant's eligibility for asylum or extraordinary circumstances relating to the delay in filing the petition. 8 U.S.C. § 1158(a)(2)(D). However, "[n]o court shall have jurisdiction to review any determination of the Attorney General" under those timing provisions. 8 U.S.C. § 1158(a)(3). In reviewing the IJ's Oral Decision, it appears that the IJ denied rather than dismissed Lhanzom's asylum application. Oral

Decision at 11 ("It is ordered that the respondent's application for political asylum, withholding, and protection under the Torture Convention, be denied."); R. at 29. A denial would suggest a ruling on the merits rather than a procedural ruling on the timing of Lhanzom's application, but a review of the entire Oral Decision suggests that this was simply a careless choice of words rather than a ruling on the merits. Earlier in the Oral Decision, the IJ found that Lhanzom had not met the one year deadline and had not presented facts sufficient to justify the delay. After that finding, the IJ did not address the asylum claim again until "denying" the claim in the final two sentences of the Oral Decision. In context, it is clear that the IJ intended to dismiss the asylum claim as untimely filed, and the petitioner's attorney conceded as much at oral argument. Indeed, at oral argument, the petitioner's attorney conceded that we lacked jurisdiction to review the asylum claim. *See Nigussie v. Ashcroft*, 383 F.3d 531, 533-34 (7th Cir. 2004) (this court lacks jurisdiction over the immigration service's decision to bar an asylum application based on untimeliness, pursuant to 8 U.S.C. § 1158(a)(3)). We will therefore turn to the claims for withholding of deportation and relief under the CAT. *Nigussie*, 383 F.3d at 534 (although this court, under § 1158(a)(3), may lack jurisdiction to consider the merits of an asylum claim, that section does not bar our review of an application for withholding of removal or relief under the CAT).

**B.**

When the BIA summarily affirms the decision of the IJ, the IJ's decision becomes that of the BIA for purposes of judicial review. *Georgis v. Ashcroft*, 328 F.3d 962, 966-67 (7th Cir. 2003). Because the BIA affirmed summarily in the instant case, we will review the IJ's Oral Decision. We review denials of petitions for withholding of deporta-

tion and denials of relief under the CAT for substantial evidence. *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003); *Georgis*, 328 F.3d at 967. The IJ's decision must be upheld if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole. *Uwase*, 349 F.3d at 1041; *Georgis*, 328 F.3d at 967. In order to make out a claim for withholding of removal, Lhanzom must demonstrate that her life or her freedom would be threatened in her home country on account of race, religion, nationality, membership in a particular social group, or political opinion. *See* 8 U.S.C. § 1231(b)(3)(A); *Cuevas v. INS*, 43 F.3d 1167, 1171 (7th Cir. 1995). Unlike the decision to grant asylum, which is discretionary even if the criteria for asylum are met, the Attorney General *must* withhold deportation if the alien meets the criteria stated for withholding of removal. *Firmansjah v. Gonzales*, 424 F.3d 598, 604-05 (7th Cir. 2005); 8 U.S.C. § 1232(b)(3)(A). Lhanzom must demonstrate by a clear probability that she will face persecution if she is removed to China. *Zheng v. Gonzales*, 409 F.3d 804, 809 (7th Cir. 2005). A clear probability exists when the applicant demonstrates that it is more likely than not that she will be persecuted if returned to her native country. *Zheng*, 409 F.3d at 809. If Lhanzom is able to show she suffered past persecution, a presumption arises that the persecution will continue upon her return. *Zheng*, 409 F.3d at 809. To obtain relief under the CAT, the petitioner must "establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2); *Nigussie*, 383 F.3d at 534. "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.16(c)(2). Other evidence considered relevant to the applicant's burden of proof for the possibility of future torture includes, but is not limited to, evidence of past torture inflicted on the applicant, evidence of "gross, flagrant or mass violations of human rights within the

country of removal," and other information regarding conditions in the country of removal. 8 C.F.R. § 208.16(c)(3). *See also* 8 C.F.R. § 208.18 (defining what is meant by "torture" under the CAT).

The IJ's denial of Lhanzom's claim was based largely on his finding that Lhanzom did not provide credible evidence in support of her claim. That decision was based, in turn, on alleged inconsistencies the IJ found among Lhanzom's Pre-Hearing Statement, her testimony and her father's testimony. Indeed, the IJ did not comment on Lhanzom's demeanor as a witness but relied entirely on these alleged inconsistencies in finding her not credible. "Credibility determinations are afforded substantial deference, but they must be supported by specific, cogent reasons." *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999). Moreover, these reasons must bear a legitimate nexus to the finding. Because the entire case turns on the IJ's determination that these inconsistencies doomed Lhanzom's claim, we turn to those alleged inconsistencies.

The first inconsistency noted was Lhanzom's use of a Nepalese passport and visa to gain entry to the United States. Lhanzom indicated on the visa that she was Nepalese and testified that she paid for this fake passport in order to facilitate her departure to the United States. The IJ concluded that Lhanzom must have misrepresented who she was to the American Embassy in Nepal, which indeed is exactly what Lhanzom testified that she did. The IJ remarked that Lhanzom had "not provided an explanation of why she misrepresented her origins and citizenship as reflected in the visa, indicating that she is Nepalese." Oral Decision at 9. Of course, Lhanzom had provided an explanation for the Nepalese passport and visa. In her direct testimony, she stated that she purchased a fake passport in Nepal in order to facilitate her entry into the United States. R. at 72. On cross-examination, she further explained that it is impossible as a Tibetan to obtain a passport in Nepal

except by purchasing a fake passport and claiming to be Nepalese. She testified that she claimed to be Nepalese because "if I say I'm a Tibetan, that I'm from Tibet and things like that, I need to have a passport. Who is going to issue a passport? If I go back [to Tibet], I'll be in prison. There is no way of getting [a] passport from the Chinese Embassy or anything, so I have to rely on this fake passport." R. at 90. She explained that after escaping Tibet, it was necessary to keep her presence in Nepal a secret from Chinese authorities. R. at 90. Moreover, when she escaped from Tibet into Nepal, she did not bring many papers with her. R. at 92. Thus, the IJ was mistaken that Lhanzom had not explained the fake passport. She had in fact provided a very plausible and reasonable explanation for the use of the fake passport and admitted these facts in direct testimony. The use of a fake passport in these circumstances was no mystery. If the rest of her story was true, Lhanzom had escaped from Tibet in a treacherous one month journey over the Himalayan mountains. As the government conceded, Chinese repression and abuse of Tibetans is well-documented. Lhanzom was not in a position to go back to Tibet to apply for a valid passport or to approach the Chinese embassy in Nepal without putting herself at great risk.[2] Thus, the IJ was incorrect as a factual matter that Lhanzom had not explained the passport and visa, and this was not a basis for finding Lhanzom not credible. *See Garcia-Ramos v. INS*, 775 F.2d 1370, 1374 (9th Cir. 1985) (petitioner's ability to obtain passport through bribery or other means may have little or no relevance to a claim for persecution).

---

[2] As we discuss *infra*, the State Department has documented the difficulties for Tibetans in obtaining passports through legitimate channels, and has also documented the dangers to Tibetans who escape to Nepal and are subsequently forcibly repatriated to China.

The IJ also found material inconsistencies in the evidence regarding the timing and extent of Lhanzom's stay in labor camps. As we noted earlier, Lhanzom submitted a written Pre-Hearing Statement in support of her asylum application. The IJ compared the Pre-Hearing Statement to Lhanzom's oral testimony and to her father's oral testimony. According to the IJ, there were material inconsistencies among these three sources of evidence. Rather than repeat the IJ's lengthy and often inaccurate depiction of these various pieces of testimony, we will confine our discussion to the IJ's errors of fact. In the Pre-Hearing Statement, Lhanzom reported that, although she did not remember much of her early childhood, she spent most of her youth in labor camps during the day and re-education meetings at night. In the re-education meetings, she was forced to sing the praises of communism and renounce her family and the former system of government. She stated this was typical of her life until 1989. In her live testimony, when asked what happened after her uncle, sister and brother-in-law were imprisoned, she stated that she hid at first in Chamdo and then was taken to a labor camp for two to three years. She testified that she was released because she was weak. Her father, as we have described, made clear that he was not present in Tibet when these things happened to his daughter but assumed that she was subjected to the same conditions as other Tibetans who were forced into labor camps once they were deemed old enough to work. From this assumption, Khampa testified that his daughter would have spent approximately ten years in labor camps, and that she then escaped to Nepal.[3]

_____

[3] The 2001 State Department Report confirms that forced labor occurs in a variety of settings in China, including in prisons, detention centers, reeducation-through-labor facilities, and at work sites where prisoners are used as uncompensated labor.

(continued...)

The IJ found Khampa's ten year remark inconsistent with Lhanzom's testimony, and found Lhanzom's oral testimony inconsistent with her written Statement. There are a number of problems with the IJ's analysis. First, he mischaracterized some of Lhanzom's testimony. For example, he faults her for stating she was in prison for two to three years but she never testified that she was in prison, only that she worked in a labor camp. He also faults the testimony about the two to three year time frame as opposed to the Statement about working in labor camps for most of her youth, but neglects to mention that Lhanzom spoke about this shorter time period in response to a specific question about what happened to her following the imprisonment of her uncle, sister and brother-in-law. She was not asked during her live testimony about her youth. Her testimony is thus not inconsistent because it addressed a shorter, more specific time period about which she was being questioned. Nor is her testimony inconsistent with Khampa's testimony. Khampa told the IJ repeatedly that he was not present in Tibet when these things happened to his daughter and that he was making assumptions based on what happened to other Tibetans. Perhaps because the IJ had admonished Lhanzom's counsel not to "interrupt" him, and perhaps because it is generally unwise to object to a judge's questions as lacking foundation, Lhanzom's attorney did not object to the IJ's questions to Khampa after Khampa admitted he had no personal knowledge and was essentially guessing at what happened to Lhanzom. In any case, testimony that is admittedly without foundation and based on conjecture cannot impeach otherwise valid evidence. *Korniejew v. Ashcroft*, 371 F.3d 377, 383 (7th Cir.

---

[3] (...continued)
Tibetans outside of detention settings also engage in labor on public projects managed by local governments, without pay. 2001 State Dep't Report at 48.

2004) (the court will not uphold adverse credibility determinations based on speculation or conjecture rather than on evidence in the record).

The IJ also found inconsistencies in the evidence regarding Lhanzom's departure from labor camps and entry into Nepal. In her Statement, Lhanzom did not address how she departed from the labor camp, stating only that in 1989, she and her husband went on a pilgrimage to Lhasa, that her husband died on the journey, that she then participated in political protests against the Chinese in Lhasa, was arrested and held for three days, that she was released and then escaped to Nepal. In her live testimony, Lhanzom stated she was released from the labor camp because there was a relaxation of Chinese policy and she was too weak to work much. She then detailed her marriage, the journey to Lhasa, her husband's death, her political activity, arrest, release and escape to Nepal. Again, these stories are not inconsistent but merely supplement each other. In reviewing the transcript of Khampa's testimony, again, the only thing that is clear is the level of confusion during his testimony as the IJ continued to question him about matters for which he had no personal knowledge. The IJ found a material inconsistency because Lhanzom stated she was released from the labor camp and Khampa called her departure an escape. Khampa's characterization of Lhanzom's departure as an escape is hardly inconsistent with Lhanzom's story. Lhanzom's departure from Tibet to Nepal certainly was an escape, and her father might see his daughter's release from labor camp due to weakness as a kind of escape. *See Iao v. Gonzales*, 400 F.3d 530, 534 (7th Cir. 2005) (noting a frequent insensitivity in immigration hearings to the possibilities of misunderstandings caused by the use of translators of difficult languages such as Chinese). And again, it is improper to impeach Lhanzom's testimony with testimony that is admittedly not based on personal knowledge.

There are similar errors in the IJ's analysis of the evidence regarding what happened to Lhanzom after she left Tibet. In her Statement, Lhanzom provided some detail about her participation in demonstrations against the Chinese government while in India. In her testimony, according to the IJ, she did not provide detail. It is difficult to see how failing to repeat details that appear in the earlier Pre-Hearing Statement amounts to an inconsistency. Indeed, we see many cases where immigration judges criticize applicants for repeating in live testimony evidence that already appears in a written statement. The main inconsistency on this point seems to be that Khampa testified that his daughter was in a monastery during the entirety of her stay in India and thus never came into contact with police during demonstrations. Again, the IJ questioned Khampa about his daughter's activities in India even though he was not present for them and had no personal knowledge. When Lhanzom was in Dharamsala and Darjeeling, Khampa was living in Sikkim. Had opposing counsel asked these questions posed by the IJ, they would have undoubtedly been met with objections for lack of foundation but counsel had been instructed not to interrupt the IJ. Testimony given by a person who has no firsthand knowledge of the facts cannot be used for impeachment. Yet this is exactly what the IJ did in his analysis.

The IJ also found inconsistency between Lhanzom's testimony that she lived in Darjeeling from 1991 through 1996 and documents she submitted showing her membership in the regional Tibetan Youth Congress of Gangtok, Sikkim. One document from the Tibetan Welfare Office states that Lhanzom is a *bona fide* Tibetan who escaped from Tibet in 1990. The document explains that she visited Sikkim to see her parents but could not stay there because Sikkim is a restricted area. This document is perfectly consistent with Lhanzom's testimony. The document states that her last departure from Sikkim was

August 7, 1997. R. at 178. Another document, on letterhead of the Tibetan Youth Club and signed by the president of the Regional Tibetan Youth Congress, certified that Lhanzom is a *bona fide* Tibetan refugee and a member of the Regional Tibetan Youth Congress, Gangtok, Sikkim, India since 1992. According to this letter, "During her stay in Sikkim, she was one of the most active member[s] of T.Y.C." R. at 179. When remarking on these documents, the IJ underlined the phrase "her stay" and concluded that Lhanzom lived in Sikkim in contradiction to her testimony and her father's testimony that she never lived in Sikkim. Darjeeling, of course, is located very close to the state of Sikkim, and there is no evidence in the record about which regional office of the Tibetan Youth Congress a resident of Darjeeling might join. Perhaps the regional office in Gangtok, the capital of Sikkim, was closer to Lhanzom's home in Darjeeling and to her parent's home in Sikkim (where she often visited) than any other office. No one asked her to explain these documents and the record is devoid of evidence on this point. The IJ's conclusion is based on an assumption and assumptions cannot form the basis of impeachment. *Korniejew*, 371 F.3d at 383.

The IJ also remarked:

> [A] second document, also part of Exhibit 5, states that "her last departure record from Sikkim was August 7, 1997," yet the respondent did not testify that she left from Sikkim, but rather obtained a passport in Nepal and left from India.

Oral Decision at 8. We begin with what is now obvious: leaving from Sikkim and leaving from India are the same thing in much the same way that leaving from Illinois and leaving from the United States are the same thing. Sikkim is a state in India and this evidence is thus not inconsistent. Moreover, the natural inference from Lhanzom's testimony is that she left from Nepal where she

obtained her passport and visa. In any case, the IJ's statement is nonsensical and cannot serve as the basis for impeachment. All of the evidence presented was consistent on the point that Lhanzom visited her parents in Sikkim and went to Sikkim to participate in political events. At some point in time, she made her "last departure from Sikkim." Nothing in the letter indicates that her last departure from Sikkim was to the United States and the again the IJ was making an assumption for which there is no support in the record.

Other obvious errors by the IJ include his finding that Lhanzom claimed in her Statement to have lived in Dharamsala for six or seven years. On the contrary, there is no such assertion in the Statement, which instead attests that Lhanzom worked in a monastery in Darjeeling from 1991 to 1996. The IJ also found there were inconsistencies regarding the extent of Lhanzom's mistreatment by Chinese authorities, but fails to specify the inconsistency. Nor could we find one. Lhanzom consistently testified at her hearing and in her Statement that she was subjected to forced labor for extended periods of time, that she was required to renounce the Dalai Lama and the former Tibetan government, and that agents of the Chinese government beat her and subjected her to posing in uncomfortable positions for lengthy periods of time if she did not comply with their wishes. Her father testified only that he knew his daughter suffered much. There was no inconsistency in this testimony. Having found Lhanzom not credible based on these alleged inconsistencies, the IJ concluded that she and her father were exaggerating the threat to Lhanzom's liberty and life if she were removed to China. Because this conclusion rested on the unfounded finding that Lhanzom was not credible, it cannot stand. *Iao*, 400 F.3d at 533 (case must be remanded to the immigration service for a rational analysis of the evidence when the IJ's opinion is unreasoned and there is no opinion by the BIA).

The government conceded at oral argument that if Lhanzom's account of her treatment in Tibet is credible, she would meet the standard for demonstrating persecution. The government also conceded that there is "no question" that the Chinese government continues to persecute Tibetan Buddhists. The February 2001, State Department Report on China ("2001 Report"), which Lhanzom submitted in support of her claim, presents a bleak picture for Tibetan Buddhists. *See Tamas-Mercea v. Reno*, 222 F.3d 417, 423 (7th Cir. 2000) (recognizing State Department reports as authoritative sources on the current political situations in foreign states, and therefore as being helpful in determining whether a petitioner's fear of future persecution is well-founded). According to the State Department, particularly serious human rights abuses persist in Tibet, where the government carried out a "severe and wide-ranging crack-down on Tibetan religious practices." 2001 Report at 2; R. at 188. The 2001 Report noted that the U.N. Committee Against Torture reported continuing allegations of serious incidents of torture, especially involving Tibetans and other national minorities. 2001 Report at 4; R. at 190. According to the 2001 Report, the Chinese government also intensified and expanded its "patriotic education" campaign aimed at "neutralizing" lamas and other persons with sympathies to the Dalai Lama. 2001 Report at 23; R. at 209. In addition to these comments, the Report contains a special section addressing Tibet, which corroborates many of Lhanzom's specific claims about her treatment in Tibet. The Chinese government strictly controls access to and information about Tibet, making it difficult to determine the extent of human rights abuses. The State Department nonetheless reported that it received credible reports that Chinese government authorities continued to commit numerous, serious human rights violations in Tibet including instances of torture, arbitrary arrest, detention without public trial, and lengthy detention of Tibetan nationalists for peacefully expressing their political or religious views. 2001 Report at

47-48; R. at 233-34. "Individuals accused of political activism faced ongoing and serious persecution during the year." 2001 Report at 48; R. at 234. Recall that this 2001 Report covered the time period *after* Lhanzom reported that the government had *relaxed* some of its policies against Tibetans. The 2001 Report documented the use of forced labor in a variety of settings, including with persons in prison and with persons in re-education-through-labor facilities. The State Department noted credible reports of imprisonment, beatings and torture used against those who refused to renounce the Dalai Lama. 2001 Report at 48; R. at 234. The 2001 Report also corroborated Lhanzom's claim that her uncles, who were Tibetan lamas, would have been subjected to especially harsh treatment by the government. The 2001 Report thus corroborates much of Lhanzom's testimony.

The newest State Department Report on human rights in China, issued in February 2005 (hereafter "2005 Report"), confirms that China continues to persecute Tibetans. More than 2000 Tibetans cross the border into Nepal each year, although the Chinese government continues to try to prevent Tibetans from leaving. The 2005 Report noted that, in October 2003, for example, the Chinese government executed a Tibetan who was forcibly returned to China from Nepal, where he had been granted refugee status by the United Nations High Commissioner for Refugees. 2005 Report at 35. In addition to the abuses of Tibetans detailed in the 2001 Report on which Lhanzom relied, the 2005 Report has added extra-judicial killing to the list that continues to include torture, arbitrary arrest, detention without public trial and lengthy detention of Tibetans for peacefully expressing political or religious views. 2005 Report at 54. "Tibetans repatriated to China from Nepal in May 2003 reportedly suffered torture, including electric shocks, exposure to cold, and severe beating, and were forced to perform heavy physical labor." 2005 Report at 57.

There were also reports that the Nepali government cooperated with Chinese authorities to repatriate Tibetans who crossed the border. 2005 Report at 57. We may take judicial notice of this 2005 Report in support of the objective reasonableness of Lhanzom's fear of persecution on her return to China. *See Medhin v. Ashcroft*, 350 F.3d 685, 690 (7th Cir. 2003) (court may take judicial notice of State Department reports that are relevant to whether a petitioner's fear of future persecution is objectively reasonable). This 2005 Report certainly suggests that a Tibetan who escaped to Nepal, and then to India, and subsequently to the United States, and who publicly protested China's treatment of Tibetans, would have a reasonable fear of persecution if she is forcibly repatriated to China.

We see nothing in the record that impugns Lhanzom's credibility. *See Korniejew*, 371 F.3d at 386-87 (criticizing the increasing reliance by the BIA and by IJs upon perceived inconsistencies in testimony as the basis for adverse credibility determinations, even in cases where the alleged discrepancies are minor or easily explained). "Persecution means punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Firmansjah*, 424 F.3d at 605. If Lhanzom is credible, the government conceded that she would meet the standard for having suffered persecution, creating a presumption that the persecution will continue upon her return. *Zheng*, 409 F.3d at 809. *See also Iao*, 400 F.3d at 532-33 (noting similar persecution of practitioners of Falun Gong in China). The government has not even attempted to rebut that presumption. *See Firmansjah*, 424 F.3d at 605 (the government may rebut the presumption that the applicant will be persecuted by demonstrating either a fundamental change in circumstances or that the applicant could avoid persecution by relocating to another part of the proposed country of removal); *Asani v. INS*, 154 F.3d 719, 722 (7th Cir. 1998) (same). *See also*

*Ghebremedhin v. Ashcroft*, 385 F.3d 1116, 1120 (7th Cir. 2004) (where a country's history of persecuting a particular religious sect is well known and nothing in the record demonstrates that the petitioner would not face the same dangers if returned there, petitioner may be entitled to a grant of the petition for review). We therefore GRANT the petition for review of her withholding and CAT claims and REMAND for further proceedings consistent with this opinion. We DISMISS her petition for lack of jurisdiction to the extent it asks us to review her claim for asylum.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*